(90 South. 666)

No. 24148.

## HADDAD v. COMMERCIAL MOTOR TRUCK CO.

(Nov. 3, 1920. On the Merits, May 30, 1921. On Rehearing, Jan. 2, 1922. Second Rehearing Denied Jan. 30, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Appeal and error ☞797(2)—Motion to dismiss three days after transcript filed too late.**

A motion to dismiss an appeal because the bond read that the appeal. was returnable to the district court, instead of the Supreme Court, was not entitled to consideration where filed more than three days after the transcript was lodged in the latter court.

### On Rehearing.

2. **Master and servant ☞405(4)—Compensable injury to driver found dead held not shown.**

In a proceeding under the Workmen's Compensation Act for the death of a truck driver who was found dead in the road with bruises on his body and the truck in gear against the stump of a tree by the roadside, evidence *held* not to warrant a finding that the servant's death was the result of accident.

3. **Master and servant ☞405(4)—Compensable injury must be shown to legal certainty.**

In a proceeding under the Workmen's Compensation Act to obtain compensation for death of servant, it is not enough to show that death was probably the result of an accident, but that such was the case must be made out to a legal certainty.

O'Niell and Dawkins, JJ., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; J. R. Land, Judge.

Proceeding by Ossie Haddad under the Workmen's Compensation Act to obtain compensation for the death of her husband, opposed by the Commercial Motor Truck Company, the employer. There was a judgment allowing compensation, and the employer appeals. Judgment set aside, and suit dismissed.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellant.

Murff & Mabry, of Shreveport, for appellee.

### On Motion to Dismiss.

PROVOSTY, J. [1] The appeal in this case is asked to be dismissed because the appeal bond, instead of reading that the appeal is returnable to this court, reads that it is returnable to the First district court of Caddo parish—the very court which rendered the judgment appealed from. Assuming this to have been an irregularity, and even a serious one, the motion to dismiss was filed more than three days after the transcript had been lodged in this court, and therefore too late to be entitled to consideration. In re Lindner, 113 La. 772, 37 South. 720. The transcript was lodged in this court on June 21, 1920; and the motion to dismiss was filed on July 17, 1920.

The motion to dismiss is overruled.

O'NIELL, J., concurs in the result, on the ground that section 9 of Act No. 112 of 1916 declares that no appeal shall be dismissed on account of any error in the appeal bond; hence it is not important that the motion to dismiss the appeal in this case was filed more than three days after the transcript was filed.

### On the Merits.

O'NIELL, J. Defendant appeals from a judgment allowing plaintiff compensation, under the Employers' Liability Act, for the death of her husband.

Her suit was dismissed on an exception of no cause of action after it had been heard on its merits. On appeal, the judgment was reversed, the exception overruled, and the case

remanded for a decision on its merits. Haddad v. Commercial Motor Truck Co., 146 La. 897, 84 South. 197, 9 A. L. R. 1380.

The only proposition that was decided on the former appeal was that the business in which the defendant was engaged, and in the course of which plaintiff's husband was performing services arising out of and incidental to his employment at the time of the alleged accident, was a hazardous business or occupation, defined in subdivision (a) of paragraph 2 of section 1 of the Employers' Liability Act, Act 20 of 1914, as "the installation, repair, erection, removal or operation of * * * engines and other forms of machinery.". The ruling was that the business or occupation of handling, selling, operating and delivering motor trucks was such hazardous occupation or business.

Plaintiff avers that her husband's death was caused by his falling from a motor truck and being run over or struck by a wheel of the truck. Defendant contends that the man's death was not caused by an accident but was the result of a physical ailment with which he was afflicted before the alleged accident.

The only question presented on this appeal is whether the evidence warrants the conclusion that plaintiff's husband's death was the result of an accident. The word "accident" is defined in section 38 of the Act 20 of 1914 as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of an injury."

It is not disputed that plaintiff's husband was, immediately before his death, driving a motor truck belonging to defendant, and that the service which he was then performing arose out of and was incidental to his employment in the course of defendant's trade, business or occupation. No one witnessed the man's death or the occurrences immediately preceding it. He was found dead in the road, about 80 feet in front of the motor truck, which had stopped against the stump of a tree by the roadside. The man who found the dead body in the road notified the coroner, who, with the sheriff and clerk of court, went immediately to the scene. On examination of the body, they found marks indicating that the man had been run over or struck by a wheel of the motor truck. They found that the truck was yet in gear, showing that it had been stopped by coming in contact with the stump. They found marks on the dirt embankment beside the road, showing where the wheels of the truck had struck and skidded. They also found an impression in the embankment, which they concluded was caused by the body of the man being jammed against the embankment. They concluded, therefore, that the man had lost control of the motor truck, had fallen from the seat, and had been run over or jammed against the embankment. They concluded that he had not been killed instantly but had walked from the place where he had fallen to the place where his body was found. They then looked for the cause of his having, as they supposed, lost control of his steering wheel; and they found a small sack of tobacco, cigarette paper and a match on the floor in front of the driver's seat in the motor truck. From these circumstances, the coroner, sheriff and clerk of court came to the conclusion that the man had undertaken to roll a cigarette while he was driving the motor truck and had thereby lost control of his steering wheel. The coroner was so convinced of the correctness of his theory as to the cause of the man's death that he made his report accordingly, deeming an autopsy unnecessary. The body was taken to an undertaker's establishment, where it was embalmed and prepared for burial. The widow, father and two other relations of the deceased viewed the body at the undertaker's establishment, and testified that they saw marks indicating that the man had been run over or struck by the wheel of the motor truck.

The death occurred on Saturday. The corpse was sent from the undertaker's establishment to the residence of the father of the deceased the next day, Sunday morning, and remained there until Monday morning, when it was returned to the undertaker's establishment, at the request of three surgeons or physicians who were then employed to make an autopsy by the indemnity company that will bear the loss if defendant be condemned to pay compensation in this case. The three physicians or surgeons testified that they found only three external marks of injury on the body, a slight bruise on the chin, another on the chest, and a larger bruise on the hip, none of which bruises, they testified, could have caused death or even serious injury. They testified that, when they cut open the body, they were surprised to find what they described as a tumor mass, about 4 inches in diameter and 5 or 6 inches in length, showing that a cancer had been growing from the right lobe of the liver, and that the growth had ruptured at its upper end. They expressed the opinion that the tumor had reached such an advanced stage of development that it might have ruptured without any act of violence, extraordinary exertion or other external cause—in fact, that such a tumor could have ruptured while the victim was lying quietly in bed. They testified that the rupture of such a tumor would cause the victim to faint and that the hemorrhage would cause death, which might result very quickly.

From this expert testimony, defendant has advanced the theory that the tumor burst merely because it had reached that stage of development at which nature demanded that it should burst, without external cause, and that the man fainted and fell from the motor truck, and that his death was the result of internal hemorrhage.

Against that theory is the uncontradicted evidence that the man appeared to be in good health when he was last seen alive. He was 27 years of age, was doing manual labor, working as a mechanic's assistant, and had not consulted a doctor during the last 17 years. No one had suspected his having a malignant growth until the doctors found the tumor mass in the dead body, on the second day after it had been embalmed.

However plausible may be the theory which defendant has evolved from the expert testimony in this case, it is far more probable that the man's death resulted from the automobile accident than that the accident resulted from a natural death. It is quite probable that the accident would not have caused death if the man had not been afflicted with a tumor. The fact, however, that he was afflicted with a fatal disease would not interfere with the widow's right to compensation for an accident which, because of the disease, superinduced immediate death. Behan v. John B. Honor Co., 143 La. 348, 78 South. 589, L. R. A. 1918F, 862.

The judgment appealed from is affirmed, at appellant's cost.

PROVOSTY, J., dissents.

### On Rehearing.

PROVOSTY, J. Plaintiff's husband was found dead on a public road leading to Shreveport. Some 20 or 30 yards further on was a truck he had been driving. Its front wheels were in the ditch on the side of the road. It had turned out of the road, almost at right angles, and stopped against the outer embankment of the ditch on the left-hand side of the road, and, presumably, had followed this erratic course after its driver had ceased to control it, for it was still in gear. Several men, who discovered the body, moved it from where it lay near the middle of the road to the other side of the ditch; and one of them notified the coroner. The latter repaired to the scene with the sheriff and the clerk of court. They

found a number of persons there. After viewing the situation, they concluded that the man had fallen out of the truck, and been fatally injured by being pressed against the outer embankment of the ditch by the hind wheel of the truck. This conclusion they reached from the following indicia: (1) The presence in the truck of the stumps of "a cigarette and match that had been just burned" (we presume these things were on the floor of the truck in front of the driver's seat); (2) an impression in the outer embankment of the ditch, as if made, not by "wood or iron or anything of that kind," but by "something with clothes or clothing on"; (3) there was fresh dirt on the hands and on the clothes in front on the lower part of the chest, down as low as the hips, just some dirt, nothing special about it; (4) bruises on the body; (5) some footprints on the road, which they thought might have been, and probably were, made by the man. Anything more vague and unsatisfactory than the testimony on the subject of the reasons why the said footprints and the said impression on the outer embankment of the road ditch should be held to have been made by the dead man it would be not easy to conceive of. Thus:

Testimony of Mr. Bell, the clerk of court:

"Q. About how far from the body was this truck, Mr. Bell?

"A. Well, from the body where it was lying when I saw it, it was approximately 60 feet.

"Q. Mr. Bell, please state in your own way what you observed, what you saw there near the truck and body.

"A. * * * I stayed there for a while, and I walked down the road just a little piece to see if I could see just what had happened. I found the truck track where it left the road, I would say, about 70 or 80 feet east of the point where the body was lying. The truck had been coming up the road on the left-hand side of the road, the right wheel of the truck being just about where the left wheel of the vehicles that usually traveled the road would be. I saw the wheel, the front wheels of the truck, had turned abruptly across the road almost at right angles. There is a little embank-

ment I would say about 18 inches high, what is generally known as a ditch, on the side of the road, and it was plain that the left wheel, left front wheel of the truck, had struck the bank before the right-hand wheel had, had not turned together at right angles across the road. About 4 or 6 feet east of where the wheels struck the bank there was an imprint in the bank where something had struck the little bank of the ditch there—the left wheel of the truck turned right up the little ditch. The hind wheel of the truck had begun to slide, and when it got nearly to the edge of the ditch it showed it just slipped right around and struck the side of the ditch, and right where this imprint was in the side of the bank where something had struck it, the left wheel began to cut into the bank and abruptly had run up that ditch for a distance of about 80 feet, and the bank of the ditch there was a little lower, and the left wheels of the truck climbed up on the bank with the left wheels on the bank and the right wheels in the ditch, run about a distance of 50 or 60 feet. The bank there raises up and was elevated, and the axle of the truck had run into the bank and cut into it and evidently choked the engine down and it stopped. The impression made in the side of the bank was very plain and showed that there was considerable impact. Dr. Hewitt at that time was viewing the body, and they had finished. I called Dr. Hewitt and Mr. Smith down, and we retraced it from the place where the automobile truck struck the little ditch bank. There were some tracks that lead off for approximately 10 or 12 steps. We were unable to track that any further, because other people there, and they had walked all around so many could not carry it further.

"Q. Well, Mr. Bell, referring to the tracks that you mentioned in your testimony, I will ask you if you noticed the size of those tracks?

"A. Well, I cannot say that I did particularly, except will say this, the tracks were the apparent size of the shoes the man wore.

"Q. In reference to the imprint you saw in the side of the bank, I will ask you to state what it looked like?

"A. Well, I would have done that in the beginning, except I thought possibly be calling for an opinion. It was clear, though, that it was not made by a piece of wood, iron, or anything of that kind; it had the appearance of where something with clothes or clothing had struck the bank, very plain.

"Q. I will ask you if in a case of that kind if a man's body was thrown against the bank, if it would make that kind of imprint?

"A. It would have, sir; unquestionably so.

"Q. Those tracks that you spoke of, Mr. Bell, did they lead in the direction where Haddad's body was?

"A. From the place—well, I will state it this way: That the tracks lead off in the direction that the motor car. This motor truck had gone the general direction and lead out towards the center of the road, the tracks. We only tracked the man about halfway between the place where I saw this imprint in the bank and where the spot that was pointed out to us as the spot where Haddad's body was picked up.

"By Court:

"Q. Had the wheels of this truck passed over that imprint in the bank?

"A. No, sir; the front wheels were west of that—

"Q. Of the imprint?

"A. Yes, sir.

"Q. Any evidence that the hind wheel had passed over the body?

"A. Right at it could not say that didn't pass over but within, just as if the impression had been made against this bank this way, the hind wheel began to shave off the bank right at that place.

"Q. I believe you stated, Mr. Bell, that the truck was very near or within a few inches of this imprint you saw in the side of the bank?

"A. The hind wheel; yes, sir. We could track the tracks of the truck very plainly.

"Q. Was that imprint—how was it located as to length?

"A. Well, it was shown in the bottom of the ditch and in side of this bank about, approximately, 18 inches.

"Q. The impression was about 18 inches long?

"A. Well, it showed in the bottom of the ditch, of course, just the length could not say, and it showed plainly on the bank from the top to the bottom of the ditch and some evidence of it in the ditch.

"Q. Was the length of that impression up and down or horizontal?

"A. It was right against the bank up and down and showed in the ditch just below it.

"Q. That bank about 18 inches tall?

"A. Yes, sir; just as if would lean against it this way.

"Q. You don't know whether the impression had been made, if made by a man, was made with his face to the bank or back to the bank—of course, nothing to indicate that?

"A. No, sir; could not say as to that.

"Q. If a large sack of flour had been pressed, thrown against the bank, would it have made something similar to the same sort of imprint?

"A. Well, in a way it would have; yes, sir.

"Q. Anything with cloth on it would leave impression similar, a similar sort of imprint?

"A. You might say so, Mr. Freyer, would have been similar, but no sack of flour thrown across there could not have made that imprint.

"Q. If any object that had cloth on it of size large enough and of the size of this imprint of about 2½ feet if pressed against there, thrown against there, would make something of a similar imprint?

"A. Yes, sir; it would have been similar; you could have thrown a hog against it and would have made a similar imprint too.

"Q. Now these, the imprint of the wheels striking this side of the ditch or bank, the first imprint of the front wheels was about how far from this imprint?

"A. Approximately four to six feet; that is, the left wheel of the truck.

"Q. And the hind wheel within a few inches, I believe, you say?

"A. It started, you may say, at the edge of the imprint almost.

"Q. That is, on the side?

"A. Yes, sir; it was very plain that the wheel had slided sideways just before it got to this little ditch, possibly two or three feet. There was no evidence of the wheel in the bottom of the ditch, and after it left the side, the right side of the ditch, we saw nothing of it until the wheel began to cut right into the bank, right at this impression that was in the bank. The left wheels ran into the ditch and cut the side of the ditch all along, the left wheels climbed up the edge of the ditch, and the truck run a little to the left all the time, and the right wheels finally got in the ditch.

"Q. Now, Mr. Bell, from the point of this imprint on the side of the ditch back to where the truck appears to have left the forward movements and gone almost at right angles, about how far back was that along that road?

"A. Let me understand you—

"Q. You got the tracks traced along the left-hand side of this road coming to Shreveport; then at a point along there they leave almost at right angles and went to the left?

"A. Yes, sir.

"Q. Now, how far was it back down the road there where the tracks leave this straight line and turn to the left before you come to the imprint in the bank?

"A. The automobile tracks for some distance down the road running up the left-hand side of the road and from the point that it turned abruptly to the left to where the imprint in the bank was approximately 12, maybe 15 feet.

"Q. And then from there on the automobile ran some 75 or 80 feet, some little distance?

"A. Ran about 150 feet before the automobile stopped.

"Q. Now, with reference to this point where the tracks abruptly left the straight line and went to the left, how far was it to the body when you first saw it?

"A. About 70 or 80 feet.

"Q. Then it was something like about 55 or 60 feet further down the road from the point of this imprint?

"A. The imprint, Mr. Freyer, in the ditch, was almost opposite the point where the automobile turned out of the road abruptly to the left from that point up to where the body was lying when I got there, was approximately 70 or 80 feet.

"Q. You know whether or not the body had been moved before you got there?

"A. I was informed so when we got there, and the point pointed out where the body was moved from.

"Q. Who was there before you got there?

"A. Well, I could not say; a number of people; don't know; some negroes, Mr. Fiske, the deputy sheriff, who resides at Grand Cane, I remember distinctly was there. I think one or two of the Ricks who reside at Grand Cane was there; quite a number of people.

"Q. At the place where the body was first discovered was there evidence of his body having been turned over, moved, etc.?

"A. No, sir; there were so many tracks there near the little spot in the road they pointed out to me—I remember there was a little wet spot in the road where the man was picked up.

"Q. No distinguishing marks about this particular footprint leading from this imprint on the side of the ditch except in size, it had certain size, no distinguishing marks about it?

"A. No, sir; there was not. That was the only track, however, that led from that place in the direction of the point where the body was found.

"Q. You only traced about half that distance?

"A. Approximately, right in direct line of where the point was shown to us as the place where the body was picked up.

"Q. In the middle of the road or what part of the road?

"A. Near the middle of the road; yes, sir.

"Q. Mr. Bell, the wet spot in the road that was pointed out to you as where the body was found, how far was that spot from the imprint that you saw in the bank?

"A. I would say approximately 80 feet—the wet spot in the road was just north, little northwest, I would say, of where the body was lying when we got there, would say about 15 feet north of the west bank of the ditch.

"Q. Did you notice whether the tracks of this truck passed over that wet spot in the road?

"A. It did not. It was not closer than, the right-hand wheel not closer than 15 feet to where this wet spot in the road was and the point where the parties showed us the body was. * * *

"Q. The point where the wheels skidded, as stated in your testimony this morning?

"A. The front wheel didn't skid at all; it turned almost abruptly to the left. The left wheel struck the ditch bank and followed the course of the ditch bank. The hind wheel skidded in a forward movement until it got opposite the place where the imprint was in the bank, and right at that time it was just on the edge of the ditch next to the road on the inside, inside ditch. There was no mark in the bottom of the ditch. The wheel went right up the little ditch, and next place was found right opposite where the imprint was made in the bank, right at the imprint that was made in the bank, the wheel begun to cut in the side of the bank and followed the course of the front wheels."

Testimony of Dr. Hewitt, coroner:

"Mr. Bell came back; had been down the road. He took me down to show those evidences. There was the place where the automobile had left the road and run into the bank, and anybody who runs a car, Judge—the wheels, the front wheels, hit the bank the back wheel skidded right where the wheels hit the bank imprint there where something had been mashed into the bank, and it rolled off at out that far where it begun to cut dirt and go on up the road.

"Q. You didn't see a sack of flour anywhere around?

"A. Judge, a sack of flour didn't make that sort of a print. A man's back and hips make that kind of print by being mashed into the bank with clothes on.

"Q. Was this impression, the soil in this bank where the impression was made, that as hard as the soil in the road?

"A. No, sir.

"Q. Much softer?

"A. Just like any embankment would be, Judge.

"Q. So there would be considerable difference between the injuries to a man run over by truck on hard road and where simply shoved against the bank and run over?

"A. Great deal of difference, yes, sir, on hard road and a soft place like that it would be."

Testimony of Mr. Smith, sheriff:

"We got to looking around as a matter of course, and we found where this truck had turned abruptly to the left and the front wheel struck the embankment and the hind wheel had slided against the embankment, and we found the impression there; we knew in reason that this party had fallen and the hind wheel of the truck rolled over him; but where the hind wheel struck the embankment was just about where the party or whatever this impression was made by the hind wheel struck looked like the object or whatever it was that made the impression, and we could see where the wheel rolled off. The truck then rolled up, the left hind wheel was in the ditch and rolled up, I reckon, 30 or 40, possibly 50 feet, little low place in the road; climbed out of the ditch on the bank and straddled it and then run into a little mound and stopped."

The impression or imprint which these witnesses saw in the ditch embankment was still there several days thereafter. How long it remained, and how long it may have been there before, no one, of course, can know. Nothing shows that the footprints were those of the dead man.

A more satisfactory theory of the cause of the man's death is given by the witnesses for defendant.

The death was on a Saturday. On the following Monday three physicians of Shreveport, of whose competency and reliability in every way there can be no question, made an autopsy, and found that the man most probably had died from the rupturing of a tumor. With respect to the outer appearance of the body and this tumor, these witnesses testified as follows:

Dr. Butler:

"Q. Did you examine the body from head to foot for marks?

"A. Yes, sir; very carefully, both Dr. Ellis and myself, and with the parties present, at least five or six looking over the body with us.

"Q. What marks did you find?

"A. We then started at the top of the head, looking all through, from the scalp down; found nothing; went down and found small scar under the chin, and then come on down and found small, another over the fifth right rib, another scar, scraped place. Something

had disturbed the skin. The only other place was rather large place two or three inches in size right on the side of the hip, right here, extending across the side. It looked like something had been scraped.

"Q. Any of these marks, were they superficial only?

"A. All involved the skin surface only; didn't go deeper than the skin so far as could tell.

"Q. Were there any bones broken at all?

"A. No, sir; we examined as carefully as could be examined; didn't find any broken bones.

"Q. Did you find any flesh mashed, torn, or bruised across the body?

"A. One, yes, sir, is my recollection.

"Q. No other marks at all on the body?

"A. No, sir; none that would be of any consequence, nothing to notice at all.

"Q. And you examined very carefully for the purpose of finding—

"A. We did; had extra good light; turned the body over two or three times.

"Q. When opening the body up, what did you find inside?

"A. First made an incision from the —— right straight down to the pubic bone, and we opened up the chest first, as first procedure in post mortem, went in the left side of the chest, and we didn't find any trouble, except the heart pushed over about 1½ inches further to the left than it should be. Now in the right chest cavity the right lung was pushed considerably out of place; there was about nearly three quarts of serum-like fluid in the chest cavity. We removed all that fluid out of the chest cavity and found that the lung had been pushed up to make space for that amount of fluid, close to three quarts, right in the top of the chest, which was separated by the diaphragm all the way across; just looked like the head of a drum. Protruding through this diaphragm was a tumor mass about between five and six inches long about four inches in diameter which had pushed through the hole in the diaphragm with smooth edges about like that and practically filled that hole up. The top part of this tumor had a rupture about as long as the finger from which it had been bleeding. Then we went down into the abdominal cavity to see where the tumor came from, and we found it attached and growing from the right lobe of the liver. Then we cut the diaphragm out about a foot in diameter and found the tumor came through the hole in the diaphragm and found this intact. Then we found in the abdominal cavity all around the intestines clotted blood from hemorrhage that had been bleeding enough to produce some swelling. Then this

fluid was taken and examined to see what it was, and it was blood serum with some formalin. Then the piece of tumor was taken and sections frozen and examined under the microscope, and it showed to be cancer.

"Q. With a tumor of this sort, this character, ruptured as you found it, do you find such condition without any violence or accident or external force that man might be lying in bed and that would rupture?

"A. Yes, sir; it could happen under any circumstances, and tumor on the liver of that kind generally does rupture sometimes itself; really to be expected.

"Q. With a tumor of that size and conditions as you found in this man, what would you say as to his condition, whether his death was imminent, whether from accident or what not?

"A. It really, from a pathological standpoint, it is hard to believe the man lived as long as he did, don't generally see anybody in the condition that man was live long. Of course, you can live several years with cancer, but any one who does anything very much in a manual way is liable to rupture it; hard to see how could keep from being ruptured.

"Q. That man then, independent of any fall or blow, pressure, or whatnot, was likely to have died any day in that condition?

"A. Yes, sir.

"Q. From the appearances on this body as you have described, would you say that he had been run over by an eight-inch hard rubber wheel on truck weighing over 4,000 pounds?

"A. Could not see anything on the body that would indicate that he had.

"Q. Did you find any organs in there that were displaced?

"A. No, sir; except those pushed by this fluid and had been pushed sufficient length of time that they were stationary, might say grown there, and we could not move that lung back; had been sufficient length of time could not be pulled back in place. The fluid had necessarily been there for days, probably weeks, the heart pushed over sufficient length of time for the heart and lung to remain over there, would not come back at all.

"Q. If there had been any pressure on that body, would it not leave any outward evidences. If had been any injury to disable this man, would it not have had to injure some organ inside?"

Dr. Ellis:

"Q. What did you find inside the body?

"A. We found a tumor mass which was attached to the right lobe of the liver protruding, projecting through a hole in the diaphragm

in the chest cavity. We found the right chest cavity filled with fluid, the heart pushed to the left, and the right lung pushed upward.

"Q. What effect did that fluid have on the position of the lung and heart?

"A. Pushed the heart to the left and the right lung pushed upward.

"Q. Had that condition existed for some little time?

"A. Yes, sir.

"Q. Had it been there long enough to have allowed this lung to grow in that position?

"A. Yes, sir.

"Q. Permanent displacement of the heart and lung?

"A. Yes, sir.

"Q. With a man in that condition, would you expect him to live very long?

"A. No, would have expected him to die at any time, his days numbered.

"Q. He could not have lived very long at all?

"A. Would not think so.

"Q. Be a matter of days or weeks, or how long?

"A. Anywhere from hours to days.

"Q. As a matter of fact, what was the proximate cause of his death?

"A. He bled to death.

"Q. Where did he bleed from?

"A. From the rupture in his tumor.

"Q. What was the nature of the structure of this tumor as to whether it was firm or friable?

"A. Very friable, easily broken.

"Q. If this body had been mashed about the abdomen with force of a truck weighing over 4,000 pounds pressing against it, what would have been the effect as to the crushing of the entire tumor inside of this man's chest?

"A. I think it would have crushed it out of shape.

"Q. Did you find any evidence of bruises on the body in the neighborhood of the abdomen or hips?

"A. No, sir.

"Q. Did you find anything to evidence that this body had been run over by a wheel with solid rubber tire about 8 inches wide on a truck weighing about 4,000 pounds?

"A. No, sir.

"Q. If this body had been mashed by such a force or run over by such a wheel, would it not necessarily have left evidence that you could have determined it?

"A. It would have."

Dr. Williams:

"Q. Did you have a careful—make a careful examination or observe the body externally?

"A. I did.

"Q. What marks did you find?

"A. Slight mark abrasion on the outside right thigh, and my reflection is little mark on his chin and slight abrasion on the right chest.

"Q. Were these superficial?

"A. Very superficial.

"Q. Independent of any tumor and its connections, were they sufficient to have disabled the man at all?

"A. Absolutely no.

"Q. If they had been the result of accident or from external violence, would they have occasioned the man to lose any time from work at all?

"A. No, sir.

"Q. They would not?

"A. They would not.

"Q. Was there any indication on the outside of this body to show that any part of it had been run over by the wheel of a solid rubber tire about 8 inches wide truck weighing something like 4,000 pounds?

"A. No, sir.

"Q. If any part of the body had been run over by such a weight, do you think would have left marks on the body?

"A. Marks of some kind.

"Q. If there had been pressure by mashing this man by truck weighing something like 4,000 pounds in the vicinity of his abdomen, would have left evidence on his body?

"A. Yes, sir.

"Q. Did you find evidence of any such injury?

"A. No, sir.

"Q. What did you find inside this man?

"A. Tumor mass connected with the lung projecting through hole in the diaphragm.

"Q. What effect did this mass in the chest have on the lungs and heart?

"A. The heart was pushed to the left and the lung pushed upward.

"Q. Had that condition become permanent?

"A. Yes, sir.

"Q. Would you say from that this fluid had been there some time or a short time?

"A. Yes, sir.

"Q. Could you estimate approximately about how long it would take for this condition to come about?

"A. Good many days.

"Q. Good many days?

"A. Yes, sir.

"Q. Would not form in five or six days, something like that?

"A. No.

"Q. If there had been sufficient force to have caused any serious injury independent of this tumor from external sources, would there have been evidence that you could have discovered on this body?

"A. I think so.

"Q. You found no such evidence?

"A. No, sir.

"Q. If the stationary object behind or under the body had been so soft that the pressure against it did not leave any evidence on the body itself, would it or not, and yet such pressure had caused death, would it or not have injured some vital organ inside the body?

"A. I think so.

"Q. Did the examination disclose injury to any organ inside the body except the lung and heart and this tumor?

"A. The diaphragm, that hole in the diaphragm.

"Q. Injury to any other—any other injury to any vital organ inside the body?

"A. No, sir.

"Q. From your complete examination of this man and his entire condition, what you have stated, what was your prognosis as to the cause of death?

"A. Hemorrhage from rupture of the tumor."

Dr. Hewitt, the Coroner, a witness for plaintiff, testified as follows:

"Q. Just state what condition you found the body in when you made the examination?

"A. Well, at first—his hands, clothes were muddy and his clothes were wet; I think the mud was from the evacuation of the bladder and the clothes were wet; also a wet spot in the road where the man was picked up. The man's privates were swollen and bruises on the lower part of the abdomen, bruises between the navel and pelvic bone. * * *

"Q. This place you found on his stomach, about where was it located?

"A. Located between the navel and pelvic bone.

"Q. The bone in front?

"A. Yes, sir; the bone in front.

"Q. About what size was that bruise?

"A. About like three fingers lying in that direction.

"Q. About three inches long and probably two wide?

"A. About three inches wide and three or four long.

"Q. It didn't extend across his abdomen?

"A. Yes, sir; right across.

"Q. Not the entire length?

"A. No.

"Q. It was about, I believe you say about

three inches wide and three or four long, something like that?

"A. Yes, sir; I didn't measure."

The man had theretofore been in poor health and weak. His employer testified as follows:

"He would work as helper in the shop, clean trucks, clean up the office, take care of cars, clean up tools, general help work about the shop, and occasionally we would use as driver to deliver trucks something of that nature unloading cars.

"Q. Well, when did he stop working in that capacity?

"A. Could not tell exactly; some time prior to the last employment he secured other employment, he was always around, and whenever we found anything he could do we gave it to him. He was always around willing and anxious to work because he needed the money, and we gave anything that we could from time to time to keep him employed."

Another witness testified that owing to his physical condition he was able to do "only little things"; only things that required "no heavy exertions."

As the road was smooth and straight, and he was an experienced chauffeur, the probability of his having been thrown out or fallen out, or, indeed, of his having lost control of his wheel, because of trying to light a cigarette, is very slight. Besides, the evidence shows that between the steering wheel and the side of the driver's seat the space was only six to eight inches—a space through which a man could pass only with difficulty.

[2] Upon the whole, and after a careful reconsideration of the case, we have concluded that plaintiff has not shown that the death of her husband was from an accident arising out of his employment. And that, on the contrary, the defendant has shown that the death was in all probability from the tumor having ruptured in due course of its development.

[3] Even if the theory of plaintiff's case— that the man had fallen out of the truck as the result of some accident and had come to his death by being pressed against the ditch embankment—were probable, this would not suffice; for the matter would still be involved in grave doubt, so much so that the court could not know with any sort of certainty that the defendant was liable. A case must be made out to a legal certainty; this is elementary, and is as true in the case of a suit under the Workmen's Compensation Act, like the present, as in any other. Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 South. 734.

In the note contained in annotation L. R. A. 1916A, 294, we find the following:

"An' accident will not be inferred where there is no evidence of any strain, and the evidence adduced is equally as consistent with the fact of no accident, as with the fact of an accident. Barnabus v. Barsham Colliery Co. (1910; H. L.) 103 L. T. N. S. (Eng.) 513, 55 Sol. Jo. 63 (apoplexy); Kerr v. Ritchie (1913) 50 Scot. L. R. 434, (1913) S. C. 613, (1913) W. C. & Ins. Rep. 297, 6 B. W. C. C. 419 (heart failure); Beaumont v. Underground Electric R. Co. (1912) W. C. Rep. (Eng.) 123, 5 B. W. C. C. 247 (heart disease)."

The judgment appealed from, which was in favor of plaintiff, is set aside, and the suit is dismissed at the cost of plaintiff.

O'NIELL and DAWKINS, JJ., dissent, adhering to the original opinion.

LAND, J., is recused.