Plaintiff instituted this suit seeking to recover compensation for a period of disability not to exceed 400 weeks. He alleged total disability due to a hernia caused by an accident which occurred while performing duties within the course and scope of his employment. He alleged his weekly wages at the time of the accident entitled him to the maximum amount of compensation per week allowed by the Compensation Act of this State (No. 20 of 1914, as amended). Plaintiff impleaded as defendant the Caddo Parish Police Jury of Caddo Parish, Louisiana. The Standard Accident Insurance Company intervened in the suit alleging it carried a policy of compensation insurance for the Police Jury covering the alleged accident and prayed that it be made a party defendant, which petition was allowed.
Defendants in answer denied that plaintiff was involved in any accident while in the employ of the Police Jury or that the hernia was due to an accident arising out of said employment. They admit the employment and amount of weekly wages, as alleged by plaintiff. *Page 86 
The lower court in a written opinion on application for rehearing disposed of the case in the following language:
"The object of this suit is to recover compensation for `a complete traumatic hernia in the right side of his abdomen'. The accident relied upon is thus described in the petition which is sworn to by petitioner:
"`That your petitioner and an assistant were putting points on bridge bars. The operation consisted in one person, in this instance your petitioner, holding a flatter on top of the bar to be pointed and the assistant striking the "flatter" with a 16-pound sledge hammer. At the time of the injury your petitioner was holding the flatter by the handle, which was approximately 24 inches long; the helper struck a blow which apparently glanced, driving the handle of the flatter back into petitioner's abdomen on the lower right side very violently.'
"Litigants, voluntarily, after due consultation and discussion with counsel, make in their pleadings the issues upon which they elect to stand or fall. If they fail to prove their allegations with reasonable certainty by a clear preponderance of the evidence, their demand is rejected. It has been repeatedly held that in compensation cases plaintiffs are held to the same strictness of proof as in other cases. If on the other hand plaintiff's testimony is seriously at variance with the sworn allegations of his petition, his credibility is correspondingly affected.
"There is nothing indefinite about the petition. It alleges upon a sudden violent accident, causing a complete traumatic hernia. Plaintiff therefore cannot recover on the possibility that a hernia occurred at some time or in some other manner during his employment.
"The character and method of the work plaintiff was doing is so graphically described and shown by photographs as to make unnecessary any detailed recital here. At about 10:30 in the morning he was engaged in sharpening the points of bridge bars. This work is done by teams of two. Plaintiff placed the heated end of the bar upon the anvil, the flatter on top of it and his teammate standing opposite and facing him across the anvil struck the flatter a heavy blow with a 16-pound sledge hammer.
"Rainer testifies thus:
"`A. He hit me with a 16-pound sledge hammer and he must have hit it in a peculiar way, didn't hit it square and the handle bounded back and struck me in the groin.
"`Q. What struck you in the groin? A. End of the wooden handle.
"`Q. With what force did it strike you? A. Well, it come back pretty hard.'
"He then goes on to say that he felt no pain, only a burning sensation as if he had the heat. This burning sensation did not come from a blow because he says, —
"`Q. What do you mean you had the heat? A. Just a breaking out in the summer and if you work around the heat, I had been working around that furnace and got hot and it begun to sting.
"`Q. You had this heat broken out around your waist where your belt fastens? A. Yes.'
"If a traumatic hernia occurred as alleged, plaintiff would have experienced sensations from two sources: pain and nausea from the tearing of the abdominal wall and excruciating pain from the blow in the groin. Yet all he felt was the burning or itching from the prickly heat which he actually had. Such testimony is utterly incredible. Doctors have time and again testified to the pain from traumatic hernia. Even if the surprising testimony of Dr. Cassity is correct that the walls of the abdomen are so fragile they will rip or split at the slightest blow, it is of no moment for plaintiff swears he received a hard and violent blow. Dr. Cassity's testimony may be correct, but it is contrary to all human experience.
"Every boy knows that a blow in the groin causes acute and disabling pain. In a boxing match a blow below the belt is foul. The fight is stopped to allow the recipient to recover. The blunt blow of a boxer is softened by a padded glove. Plaintiff claims to have been hit by the small end of the flatter handle driven violently back by a hard blow from a 16-pound sledge hammer, yet felt no pain or sensation other than the itching of his prickly heat, which certainly has no connection with the blow. Even if some blow was given, if plaintiff felt no sensation, how does he know that it caused the subsequently discovered hernia?
"Plaintiff testifies that he went on with his work without complaint or interruption. Almost immediately afterward he had occasion to consult the foreman but said nothing about any blow, any pain or any hernia. This man had previously had one *Page 87 
hernia, cured by operation, and was familiar with its symptoms. Again at three o'clock he saw the foreman in regard to getting off to attend to some business and again made no complaint. The date alleged upon was Saturday. No complaint was made until Monday morning. As to the occurrences in the interim we have only the testimony of plaintiff and his immediate family.
"The sledge hammer member of the team was a man named Smith. He was summoned by both parties but only offered by defendant. These men were doing heavy work where every act of one was dictated by some act of the other. Smith was in a far better position to observe what happened to plaintiff than the ordinary fellow-workman. He says that he did not see the flatter strike plaintiff and that the plaintiff never made any claim that it did. There was not any interruption or slackening of the work. Smith says in answer when asked if he was watching plaintiff:
"`You bet I was, yes, sir, any man when two men are working together has got to watch each other. I have been doing public work thirty odd years and have been taking care of the other fellow, something might happen to him, and you both have got to watch each other when you work together, especially that kind of work, you might make an awkward lick and hit the other fellow if you don't just pay attention as close as you can to what is going on.'
"He testifies that plaintiff was holding the flatter in an awkward position but that he did not hold it with the end of the handle towards his body. The handle of the flatter is from 24 to 30 inches long. The head is heavy, compelling the operator to grasp it in the middle. This causes the end, as shown in the pictures, to be alongside of the body and not pointing toward it. When asked if he would have noticed Rainer holding the flatter handle pointing toward his body, Smith said:
"`I would have been mighty apt to if the man had been holding like this, it is kinder an awkward position for a man to hold a tool and another man hitting with a 15-pound sledge hammer, it is kinder like a man in front of a gun and the other fellow fixing to touch it off.'
"Through counsel plaintiff asked for a new trial because he and Smith had had trouble and that Smith was bitter toward him. The motion is not supported by the affidavit of plaintiff. Smith was summoned by plaintiff and not used, showing that plaintiff knew his testimony would be unfavorable. On cross-examination Smith testified that he and the plaintiff were entirely friendly. This testimony, though plaintiff had full notice and opportunity, was neither impeached nor rebutted.
"Besides the cases where there is an accident as defined in the Act, the jurisprudence allows recovery where some organ suddenly breaks down from normal but heavy work. Jackson v. Travelers' Ins. Co., 180 La. 43, 156 So. 169; Renfrow v. Caddo Parish Police Jury [La.App.], 155 So. 291; Biggs v. Libbey-Owens-Ford [Glass Co., La.App.], 170 So. 273; Lynn v. Arkansas Fuel Oil Co. [La.App.], 192 So. 764.
"Plaintiff relies heavily upon the Biggs case. It is not in point. The hernia was inguinal and not traumatic. It was brought on by heavy work, reaching across and lifting large pieces of glass weighing 36 pounds and more. In that case plaintiff felt something give way. In the present case plaintiff was not doing any heavy work. If the accident testimony is discredited, there is nothing in the record to show when and how the hernia developed. Nor does this case come under the long line of authorities where plaintiff was working with great exertion or under unusual conditions.
"Compensation can only be recovered where disability or death was produced by either a sudden or an unusual strain or physical exertion; by the giving way of some vital organ or organs as a consequence of manual labor regularly requiring heavy lifting or straining, or by exhaustion from heat while in the discharge of duty. Nickelberry v. Richie Grocer Co. [La.App.], 199 So. 415; Kirk v. E.L. Bruce Co [La.App.], 190 So. 840.
"In Burks v. Central Surety Insurance Company [La.App.],6 So.2d 45, recovery was denied where it was shown that a ruptured ulcer was caused by unusually heavy strain or physical effort.
"The following from Boykin v. We Hope Gas Oil Company [La.App.], 2 So.2d 528, perfectly fits this case:
"`In 1936 plaintiff had a left inguinal hernia and was operated on. He therefore certainly knew the symptoms of hernia, and if he received his present hernia on the night of December 9th, due to strain which would cause a tearing of the muscles in that part of the body, he certainly should have known what it was and reported it. It is *Page 88 
not reasonable to think plaintiff would have continued his heavy work and not let anyone know he had been hurt.'
"In Capers v. Arkansas Natural Gas Corporation et al, [La.App.], 195 So. 618, 620, we find:
"`It is shown and well known that hernias may be produced from many causes. Straining and heavy lifting are common causes, but severe coughing, sudden falls and any violent physical action or strenuous movement of the muscles of the abdomen also, sometimes, bring about conditions terminating in hernia. It is impossible to determine the age of a hernia from physical examination. When one suddenly arises, almost invariably it is accompanied by intense pain and considerable discomfort. It is unusual for a person who suddenly sustains a hernia to not make an outcry at the time, or otherwise acquaint those about him of the fact.'
"See, also, Deville v. Dennis [La.App.], 152 So. 154; Haddad v. Commercial Motor Truck Co., 150 La. 327, 90 So. 666, to the effect that it is not enough to show that death or injury was probably the result of an accident but that such was the case must be made out to a legal certainty.
"It is clear from the above authorities that if plaintiff has failed to prove with legal certainty the violent accident alleged upon he cannot recover on generalities, probabilities or possibilities.
"This case is singularly like those of Jackson v. Gifford-Hill Company [La.App.], 186 So. 875, and Burrough v. Louisiana Iron Supply Company [La.App.], 199 So. 445.
"Our careful re-examination of the record and the authorities convinces us that our judgment was correct.
"The motion for a new trial is accordingly overruled."
A judgment was signed in accordance with said opinion rejecting plaintiff's demands and he is now prosecuting this appeal.
The basic reasoning for the opinion of the lower court is that plaintiff alleged he received a severe blow in the region of the groin which caused a traumatic hernia, and since he so alleged, he is bound to sustain that position by a preponderance of the testimony and cannot recover on any other ground even through the hernia he has, which is admitted, was caused by an accident of lesser severity or from the strain of his work.
It is our opinion the lower court's finding is based upon a too strict interpretation of the Compensation Act and the pleadings in a compensation case, and that is especially true in this case for the reason none of the testimony offered by the plaintiff was objected to by defendant and it is a well-settled rule that the petition will be enlarged where testimony to enlarge it is admitted without objection.
Plaintiff alleged that he and his assistant were engaged in putting points on bridge bars; that he was holding the "flatter" on top of the bar to be pointed and the assistant was striking the flatter with a 16-pound sledge hammer; that the handle of the flatter was approximately twenty-four inches in length and the assistant struck a glancing blow, driving the handle back into plaintiff's abdomen on the lower right side very violently, and as a result of the blow he suffered a traumatic hernia in the right side.
Plaintiff's regular work with the Police Jury was that of extra foreman, doing bridge work and shop work in highway maintenance. He had held this job for six years and had never been laid off except for eight weeks, approximately two and one-half years before the date of the alleged injury, when he was operated on for a hernia in his right side. At the time of the alleged injury, July 26, 1941, plaintiff was working as a blacksmith, "subbing" for the regular blacksmith who had injured a finger two days before.
Plaintiff testified that at the time of the accident he and his helper were engaged in putting points on some bridge bars which were made out of driving shafts of automobiles. The process was to place the bar in the furnace and when it got hot to place it on the anvil, holding the bar in the left hand, then with the right hand place the flatter, which had a wooden handle twenty-four inches in length, on top of the bar. The flatter was 3" X 3" in dimension. Mr. Smith, the helper, would then strike the flatter heavy blows with a 16-pound sledge hammer. The helper stood on the opposite side of the anvil from plaintiff and directly in front of him.
Plaintiff describes the real accident and the results of it as follows:
"A. He hit with a 16-pound sledge hammer and he must have hit it in a peculiar *Page 89 
way, didn't hit it square and the handle bounded back and struck me in the groin.
"Q. What struck you in the groin? A. End of the wooden handle.
"Q. With what force did it strike you? A. Well, it come back pretty fast and hard.
"Q. When it struck you, what did you do? A. Well, I just kept on working on that bar, went ahead and finished that bar, and that was the last bar we had to work on, so when we got that one done Mr. Smith put the sledge down and walked on out, outside the shop, and I took the flatter and hammer and we did some work there, and I turned and went to get a drink of water out of a keg and I felt as if I had the heat from here up and this burning sensation and I rubbed myself, my stomach felt just like I had the heat.
"Q. What do you mean you had the heat? A. Just a breaking out in the summer and if you work around the heat, I had been working around that furnace and got hot and it begun to sting.
"Q. You had this heat broken out around your waist, where your belt fastens? A. Yes.
"Q. Then what did you do? A. Went in and made report to Mr. Rodgers, the shop foreman, as to what we would do the rest of the day, and then we went and worked on a broom, a drag broom — in the meantime I had told Mr. Rodgers I would like to get off earlier that afternoon, and I come in about three o'clock and I begun to feel pretty bad, didn't feel like working the rest of the day, and I had told him I wanted to get off and he let me off at three-thirty.
"Q. Now, after this handle of the flatter struck you in the abdomen did you have any sensation in the region or in the place where you were struck? A. Kinder a burning sensation is all to it.
"Q. It was not an acute pain? A. No.
"Q. Did you feel of your side? A. I just felt it through my clothes, began to rub it, and had no signs, no more than just a burning sensation.
"Q. No signs of any swelling or rupture through your stomach or walls of the stomach? A. Not until that night.
"Q. What time did you leave the shop? A. About three-thirty.
"Q. When you left the shop where had you planned to go? A. Well, I had planned to go over and see Mike Montgomery, he was handling a case for my mother and she wanted me to drop by and see if he had completed it.
"Q. Did you go by? A. No, I didn't go by, I went straight home.
"Q. Why did you change your mind? A. Well, I just didn't feel like talking, didn't feel like worrying with it.
"Q. What do you mean by you didn't feel like it? A. I had fever that evening, just felt bad, felt bad from the heat and fever.
"Q. What? A. I was sore in there and having fever, I didn't feel like going by and talking to Montgomery.
"Q. Did you go home then? A. Yes, went on home.
"Q. What time did you get home? A. About four o'clock.
"Q. Usually what time is quitting time down at the place? A. Four o'clock.
"Q. But this day you left earlier and got home about four o'clock? A. Got home about four o'clock.
"Q. Now when you got home did you notice anything peculiar about your side? A. Well I went in and told my wife I wanted to take a bath, changed clothes and she went in and fixed the bath water and got it ready and she called me and I went in to take my bath and noticed I had a kind of puffed up place in my groin and after I got through my bath I called her and showed it to her, and told her I got a lick that day and she looked at it and I said well, it may be a bruise, just bruised.
"Q. What size place was it there? A. Well it looked like about like a half dollar, puffed up about like the size of a half dollar.
"Q. Was it the same color as the rest of your abdomen? A. Yes, it looked to be.
"Q. Could you just look at it and tell there was something wrong or did you have to feel it? A. You could see it was puffed up a little bit.
"Q. Was there any discoloration around the area at that time? A. No, I never noticed any."
Plaintiff further testified that as soon as he had his bath he went to bed and only got up at meal times that night and the next day, Sunday; that the next day the bulged place in his side was larger and very sore and that he bathed it in alcohol all day Sunday. That his son came to see *Page 90 
him on Sunday and wanted to know why he was in bed and plaintiff told him he had received a blow in his side the day before and showed the bulged place to his son. The next morning, which was Monday, plaintiff got up about nine o'clock and went to his employer's warehouse and reported to his superior about receiving the blow in his side and its results. He was sent to a doctor and later to two or three others, all of whom decided he had a complete hernia in the right side and that he was incapacitated for hard labor such as he was performing on the day of the alleged accident.
Immediately after the accident plaintiff continued to hold the bar and flatter until three more licks were struck by the helper. That was the last bar to be worked upon and he and his helper immediately separated and plaintiff did other work until about three-thirty P.M. when he asked to get off to attend to some business but plaintiff felt so bad after getting off, he went straight home instead. He did not report the accident to anyone on the day he claims it occurred for the reason he did not think it was serious. Plaintiff's wife corroborates him in regard to what happened after he came home. His son also corroborates him as to what took place on his visit to his father on Sunday after the alleged accident on Saturday.
Mr. Gauthier, the regular blacksmith, testified that it was not unusual for the flatter to jump back when struck with a sledge hammer and that the handle had on occasions struck him in the abdomen while performing the same kind of work. Mr. Smith, the helper, testified for defendant and it is on his testimony that the lower court found that no accident occurred, as alleged by plaintiff. His testimony, when taken as a whole, we think, gives support to plaintiff's testimony. It is true he testified he did not see plaintiff receive the blow in the abdomen, as alleged, but he testified that plaintiff was not holding the flatter in the same manner the regular blacksmith would hold it and that plaintiff "was holding it in an awkward position to what any blacksmith would I ever noticed."
Mr. Smith further testified: "A. No, sir, I don't remember, sometimes the tools slip off, slip to one side and of course that checks you up until you get it back on there before you strike it again, and maybe by him not being my regular blacksmith, and not used to striking he didn't hold the handle just right and it slipped a little to one side and bounced off, slipped off."
He also testified:
"Q. Did you ever see him hold it with the end of the handle placed toward his body? A. No, I never noticed it.
"Q. Would you have noticed it? A. I would have been mighty apt to if the man had been holding it like that, it is kinder an awkward position for a man to hold a tool and another man hitting with a 16-pound sledge hammer, it is kinder like a man in front of a gun and the other fellow fixing to touch it off. * * *
"Q. Now, as a matter of fact, Mr. Smith, were you paying a whole lot of attention to how Mr. Rainer was holding that flatter or were you watching your job where you were hitting with that sledge? A. You bet I was, yes, sir, any man when two men are working together has got to watch each other, I have been doing public work thirty odd years and have been taking care of the other fellow, something might happen to him, and you both have got to watch each other when you work together, especially that kind of work, you might make an awkward lick and hit the other fellow, if you don't just pay attention as close as you can to what is going on.
"Q. The flatter you were about to hit was two inches square? A. About.
"Q. You had your eye on that, watching what you were doing? A. You bet.
"Q. Exactly what you would have been doing? A. In other words when he placed it on there I have got to watch it, if he don't set it on there just right I am not going to hit it until he gets it set straight up, because if he don't put it on right then there is no use hitting.
"Q. You were watching that flatter where you were hitting? A. Yes, sir."
This testimony of Mr. Smith does not, to our minds, disprove the testimony of plaintiff or even make his testimony as to the accident doubtful. Experience has taught us that the last quoted testimony of Mr. Smith is true, that is, that his eyes were focused on the 3"X3" flatter. If they had not been, he could not have expected to hit it at all much less to hit it squarely. This being true, he very probably would not have noticed that the handle struck plaintiff. There was nothing to call his attention to it as plaintiff did not make *Page 91 
any outcry and paid very little attention to the blow at the time.
We have the further irreconcilable facts to corroborate plaintiff's story of the accident: He did not have the hernia when he began work on the morning of the accident for it is shown conclusively that he could not have performed his work if he had been in that condition he was after reaching home the same afternoon. Plaintiff performed his labors on that day in a normal manner. Several hours after the blow in the abdomen was received, he went to his home and found the bulging in his right side at the place where he received the blow. The next day it was larger and very sore and on Monday following it was pronounced a hernia when examined by a doctor of defendant's choice.
We are convinced plaintiff received the blow in the right side of his abdomen at the time he alleged. Something occurred on the day of the alleged accident to at least cause the final culmination of a complete direct hernia and it is only logical to find from the above testimony that the blow from the handle of the flatter was the cause.
Defendant offered three doctors, one of whom testified that plaintiff's hernia was not an inguinal nor a femoral hernia, but was caused by a weakening of the walls just under Poupart's ligament. He described a direct hernia as one which comes directly through the abdominal wall and down through the inguinal canal and an indirect hernia as one which goes through the inguinal ring and through the abdominal wall and does not follow the inguinal canal at all. The doctor further testified:
"A. This protrusion, in my opinion, passes along the outside of the internal ring and follows along the side of the inguinal canal.
"Q. How did it get out of the abdominal cavity? A. A weakness developed.
"Q. Where? A. At the site where the operation was performed, some place in there became weak enough to let the peritoneum through there and that formed a sac.
"Q. It is the abdominal walls that enclose the abdominal cavity? A. We don't speak of it as an organ, it is a closed sac that lines the whole abdominal cavity.
"Q. The peritoneum lines the abdominal cavity? A. Yes.
"Q. Just what is this protrusion from? A. In my opinion it is from weakness in the muscles, tissues and fasciae surrounding the inguinal canal.
"Q. The muscles, tissues and fasciae, do they not constitute either in whole or in part the abdominal wall? A. Sure they constitute a part of the abdominal wall."
The doctor did not connect the blow from the flatter handle with the hernia for the reason he found no external evidence of trauma. He stated the present hernia is about one-tenth of an inch from the old scar caused by the hernia operation two and one-half years ago.
The next doctor used by defendant is positive plaintiff has a femoral hernia, one which goes down through the femoral ring instead of through the inguinal ring. He further testified:
"Q. What in your opinion, Doctor, is the origin of this hernia, that is to say, whether traumatic or not? A. Usually there is some weakness in the region where the hernia occurs, that is usually the case, and it might have been strain, hard work, strained these muscles and may have forced the femoral ring open and a piece of the intestine forced its way down through — that would be the common cause."
This doctor would not say that the hernia plaintiff has was not caused by trauma and would not say the blow he received did not have any connection with the development of the hernia. The doctor further testified:
"Q. As I understand, this hernia let us say here was where the abdominal wall is involved was brought about by abnormal weakness, or an abnormal weakened condition of the abdominal wall in a given area they can be caused by the after effects of an incision, may be a severe bruise or blow, or by an incision made with some sharp instrument, or in some cases where you have a weakness in the wall, you have a protrusion from the inside and have a hernia? A. Yes.
"Q. Would it not be possible for a blow to be struck a given area, the area shown this afternoon, or let us say this morning, and the man continue his normal activities of life and work at manual labor and that a strain, taking advantage of that previous weakened area or bruised area and gradually emit maybe over as much as a twenty-four hour period? A. I think that is possible. *Page 92 
"Q. Would it not be possible for the fasciae of the abdominal wall to be partially separated or indefinitely weakened by a blow and yet hold together by the tissues between them and subsequently the protrusion gradually spreads them apart and the protusion occurs? A. Yes."
This doctor further testified the present hernia is about one to and one-half inches from the old scar. He also gave the following testimony:
"Q. In order for traumatic direct hernia to occur is it necessary that the trauma complete the tear through the fasciae at that time? A. No, it might weaken it.
"Q. Now the sort of blow which would be required to sufficiently weaken the fasciae to permit subsequent hernia would be dependent upon a number of factors? A. Yes.
"Q. It would depend for one thing on the angle of the blow? A. Yes.
"Q. For another upon the condition of the person's abdominal wall? A. Yes.
"Q. It might also be dependent upon the pressure by the intestines or other organs in the abdominal cavity? A. Yes.
"Q. It might be dependent upon the nature of the exercise that he subsequently engaged in? A. Yes."
Defendant's third doctor was of the opinion plaintiff had a femoral hernia and that no hernia was ever caused by just one blow; that a number of blows or strain over a period of time was necessary to produce a hernia. His entire testimony is based upon this theory, but if a hernia is in the process of forming and the walls have become weakened, there can be no doubt that a blow on the weakened walls of the abdomen can further weaken them and hasten the protrusion.
The one doctor used by plaintiff describes a direct or indirect hernia just the opposite of the description given by defendant's first doctor. He also testified that the injury plaintiff received caused the hernia he now has, which he defined as a direct traumatic hernia, not an inguinal nor a femoral hernia, and said it was not unusual for evidence of the hernia not to show up until ten or twelve hours after receiving such a blow and that one might work for several hours after receiving a blow such as plaintiff did and there would not necessarily be any external evidence of the trauma. The doctor was of the opinion that hernias are not caused by one blow or one strain but by a series of licks or strains.
We have reviewed the medical testimony in this case, not for the reason that it can be of much help to us in a final determination thereof but principally to show the irreconcilableness of it. All four doctors testified plaintiff was suffering with a hernia which was disabling. Two of them say it is a femoral hernia and the other two say it is not, and the last two define it differently. If we should accept the theory of two of the doctors that hernias are not caused by a single blow, it could make very little difference in determining the case for we would then be forced to assume that plaintiff had a symptomless hernia in process of formation and the lick he received was the cause of the final break-through and protrusion which has rendered him totally disabled from following any occupation or trade he is qualified to follow. Before he received the blow, he was able to carry on his labors without difficulty or pain and a few hours after receiving it, he was totally disabled.
We are convinced that plaintiff has made out his case and is entitled to compensation as prayed for.
It therefore follows that the judgment of the lower court is reversed and there is now judgment for plaintiff against defendants, in solido, in the sum of $20 per week for a period of disability not to exceed 400 weeks, weekly payments to begin as of July 26, 1941, and each payment to bear 5% per annum interest from the due date until paid and for all costs.