## TATE v. GEORGE A. FULLER CO. et al.
### No. 1025.

Court of Appeal of Louisiana. First Circuit. Oct. 5, 1932.

Chas. A. Holcombe, of Baton Rouge, for appellants.

Daspit & Huckabay, of Baton Rouge, for appellee.

LE BLANC, J.

Plaintiff, John M. Tate, worked for a few days for George Fuller Company, one of the defendants herein, while that company was engaged in constructing the new capitol building at Baton Rouge, La. On February 20, 1931, he was working on a night crew, spotting piles. His position was under the pile driver, and while there, at his work, he was struck. As a result of the blow, he alleges that he suffered a fracture of the skull, also of two vertebræ of the spine, and also a rib.

He instituted this suit for compensation against his employer, and, alleging that the Union Indemnity Company carried the employer's liability insurance covering the risk, he made that company party defendant and prays for judgment against both, in solido. His claim is for total, permanent disability.

He alleges that he was being paid at the rate of $3 per day and working seven days a week, and prays that his compensation be fixed at $13.65 per week for a period of 400 weeks. He also asks that the fees of the expert and medical witnesses used by him in the preparation and trial of the suit be fixed and taxed as costs.

Both defendants admit that plaintiff was employed as he alleged and that he was injured while so employed, but aver that his injury was restricted to a fracture of the skull which has entirely healed and that he has fully recovered. In the alternative, they plead that his disability is only temporary and partial and that he is able to do work of some reasonable character. They both dispute the rate of pay which he alleges he was receiving, averring instead that he was only being paid $18 per week.

The lower court rendered judgment in favor of the plaintiff against both defendants, in solido, decreeing him to be a total disability and entitled to compensation at the rate of $11.70 per week during his period of disability, not beyond 400 weeks, however. The judgment allows a credit of $152.10, being compensation received by plaintiff during the time defendants recognized their liability. The defendants appealed, and plaintiff has answered asking for an increase in the rate of compensation to the amount demanded in his petition.

In considering this case, we find, in the first place, that in the plaintiff who prosecutes this claim we have a rather eccentric character whose testimony has to be read in the light of the facts revealed by his cross-examination, most of which are admitted by him. We learn that on a certain occasion, not so long before his injury, in order to pretend to his wife that he had been held up, he cut himself with a razor blade, hit himself on the head with a brick, and tied his hands behind his back. He was found unconscious in this condition at about 9 o'clock at night. He had no other explanation to offer for such actions save that it was a bit of foolishness and that he was drunk. His own testimony, however, shows that it was after these things had happened that he started drinking. Of course it is a fact, in this case, that he was actually hurt by the falling roller and it cannot be said that he is altogether pretending; but we do believe that his actions just referred to open the door to some slight suspicion about the whole of his testimony, and lead us to consider him as a person likely to exaggerate his trouble.

It was, as already stated, on February 20, 1931, that he was struck on the head by the falling roller. He was attended to by Dr. T. B. Bird, who testified that he sustained a fracture of the vault of the skull for which

he treated him, in a hospital, for approximately one month. After that period, he permitted him to go home, confined him to resting in bed for two weeks, after which time he was to report to him again. Dr. Bird states positively that plaintiff at this time made no reference whatsoever to any injury to his spine, and he cannot conceive of so severe an injury as a fracture of two vertebræ being overlooked. He says further that the pain from such an injury would have been greatest right after the injury and would have gradually decreased. This appears to us, as laymen, as most plausible. Nevertheless, it is not until two months after that we have positive proof that the plaintiff did complain about his back in a letter written to Dr. Bird in which he informs the doctor that he cannot report to him as he should at that time because his back hurts him too badly. Plaintiff's mother testifies that she spoke to Dr. Bird about her son's back injury the day after the accident. She says that Dr. Bird showed her an X-ray of the skull and explained it to her, and that she "asked him to please do something for his back," and the doctor answered that he could not say what the trouble was, but supposed that it was a shock and that he would get all right. It is difficult to understand, if the injury to the back was called to Dr. Bird's attention, why he would have wanted to overlook it. He certainly realized the severity of the skull injury, and it would have made no difference whatever at the time in the rate of compensation plaintiff was to receive, as the skull injury of itself rendered him totally disabled.

Plaintiff undoubtedly has some trouble with two of the vertebræ of the spine, the eighth and ninth thoracic veretebræ of the back, as some of the experts refer to them, but the important question is to ascertain whether the condition results from a fracture caused by the fall of this heavy roller on his head, as alleged in his petition. The decision of that question depends on an interpretation of the expert medical testimony in the case.

Plaintiff placed three experts on the stand, Drs. M. D. Ratcliff, J. A. Carruthers, and T. M. Berry. A like number appeared for the defendants. They were Drs. Ernest C. Samuel, L. J. Williams, and J. C. Menendez. Drs. Ratcliff, Samuel, and Williams are expert radiologists; Dr. Carruthers is an eye, ear, and nose specialist; Dr. Berry is a general practitioner; and Dr. Menendez also does a general practice but also knows how to read X-ray plates.

Dr. Ratcliff, who lives at McComb, Miss., testifying from the X-ray picture of plaintiff's spine which was made by himself, says that it showed a decrease in length of the eighth and ninth thoracic vertebræ of about a half inch, and that the two vertebræ had been lately fractured. He is firmly of the opinion that the fracture exists and is shown by the X-ray. In fact, he states that there is no question in his mind about the two vertebræ having been lately fractured. On cross-examination he says that it is possible to have a fracture of the vertebræ without a shortening, but there could not be a shortening without a fracture. This, however, is not the reason why he concluded there was a fracture in this case. Here, he says, it is indicated by a line of rarefication passing through the vertebræ. We observe, however, that shortly after having made this rather positive statement about there always being a fracture where there was a shortening, on being asked whether there were other causes than fractures that could make one vertebræ appear shorter than the others, he answers: "Yes, diseases of the bone, tuberculosis, syphilis and any number of other things." "Could it be congenital?" he is asked, and he answers: "Yes, that is possible; we often see a man with one arm shorter than the other." The last question he is asked on recross-examination is: "Taking into consideration the degree of the injury indicated by the picture in question and that it had been shortened as to one of the vertebræ, would that produce total permanent disability?" To which he replies: "It is possible, but I would not say that it has." Thus we note from the testimony of this, plaintiff's principal, witness who at first was so set in his opinion, that the question of a fracture is not so easy to be resolved one way or the other. The most favorable part of his testimony to the plaintiff is that he is positive that he sees a fracture line in the X-ray picture and that line indicates the fracture.

Counsel for plaintiff, who seems to have to rely on the testimony of Dr. Ratcliff for a decision in favor of his client, finds great comfort in what he says is the corroboration of that testimony by Dr. Samuel.

As we read Dr. Samuel's testimony, he agreed with Dr. Ratcliff to the extent only that there was some alteration in the size of the vertebræ. There is some deviation from the normal in the eighth and ninth dorsal vertebræ, but, as to what is the cause, he says he does not know. "Would you say from a reading of it (the radiograph) that the vertebræ are fractured?" he is asked, and he answers: "I can't see it." The abnormal deviation in the vertebræ does not necessarily mean a fracture, according to this doctor, who says that he has seen some, in other cases, without fracture. This expert appeared to be very fair admitting the unusual condition which existed, but he most certainly did not testify that there was a fracture. On the contrary, he says that he would not testify as to any fracture unless he saw a fracture line, and he was unable to see such a line in the skiagraphs of either Dr. Ratcliff or Dr. Williams. It would appear then that there is a material disagreement between Dr. Samuel

and Dr. Ratcliff on the most important point to be considered.

Dr. Williams, who had also made a picture of the plaintiff's spine, could see no evidence of a fractured vertebræ in reading it, although it did show an old fracture of the eighth rib on the right side, anteriorly. Asked to read the radiograph made by Dr. Ratcliff, he says, after doing so, that he again sees no evidence of a fracture. Questioned about the difference in length of the vertebræ, he says that they vary in width and that in the same individual there may be a variation.

Dr. Menendez is equally as positive in his testimony that the radiograph does not show a fracture of the vertebræ. He also admits a difference in the width (Dr. Ratcliff referred to this as the length) of the vertebræ, but insists that there cannot be a fracture without a fracture line, and he cannot detect any in the pictures before him.

Dr. Berry's testimony was based on a clinical examination of the plaintiff from which he concluded that there was a trauma to his back and in addition to that he had a curvature, commonly called humpback. The humpback condition existed, however, before plaintiff ever was injured. This doctor found a knot at the place where plaintiff claimed his injury existed in the back, which he says indicated trouble there severe enough to incapacitate him. We find, however, that he is the only one of the several doctors who could detect such trouble from a clinical examination only. The other doctors could not agree with him in his findings in this respect.

Dr. Carruthers' testimony was more in reference to the skull injury, and in effect his opinion, based on what were similar symptoms in other cases, is that plaintiff is not able to do manual labor. Dr. Ratcliff, testifying about the skull injury as shown by the X-ray pictures, says that there is a certain density in the region of the fracture that would indicate scar tissue. He, however, does not dwell on this injury at any length, and we do not understand him to mean that it contributes to plaintiff's total, permanent disability. All witnesses for defendant admit that there was a fracture of the skull, but that the same is entirely healed and can cause no further disability.

With regard to the injury to the spine, plaintiff has to rely entirely on the testimony of Dr. Ratcliff to support his claim for disability resulting from a fracture. No reason appears why the testimony of this one expert should be accepted to the exclusion of that of the others. Dr. Samuel certainly did not agree that there was a fracture of the vertebræ, and the other experts for defendant were positive that there was no fracture. Dr. Samuel, it is true, in admitting that there was a deviation in the vertebræ from the normal, did say that it could have been caused by an injury to the spine; but is this, in view of the rest of his testimony and that of the other witnesses for defendant, and in view too of his own expert's reluctance in saying that the deviation would produce permanent total disability, sufficient on which to rest a judgment in favor of the plaintiff? We believe not. In the recent case of Boudreaux v. Rossen, 19 La. App. 188, 139 So. 706, following the rule laid down by the Supreme Court in Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734, and Haddad v. Commercial Motor Truck Co., 150 La. 327, 90 So. 666, we held that a compensation suit does not present any exception to the general rule that a plaintiff must prove his case to a legal certainty. The plaintiff in this case having, in our opinion, failed to do so, his claim for compensation must be rejected.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be and the same is hereby avoided, annulled, and reversed, and it is now ordered that there be judgment in favor of the defendants George A. Fuller Company and Union Indemnity Company and against the plaintiff John M. Tate, rejecting the latter's demand herein and dismissing his suit.

ELLIOTT, J. (dissenting).

I think the judgment appealed from should be affirmed. The decision of the case depends on the appreciation of testimony and of certain facts and circumstances which may be regarded as established, the weight which should be given to the conflicting opinions of physicians and of X-ray experts in reading skiagraphs; those called by the plaintiff testifying favorably to his cause; those by the defendants unfavorable to the same, except Dr. Samuel's, whose testimony seems to me to support the cause of the plaintiff. Defendants' expert opinion testimony, except Dr. Samuel, was given by parties in the actual service of the defendant Union Indemnity Company and presumably receiving a salary for their service. The experts called by the plaintiff were ordered paid fees fixed by the court and would receive nothing unless plaintiff recover; but under all the facts and circumstances, I think the judgment appealed from correct and that it should stand as rendered. I therefore dissent.