## TERRY v. SPARCO OIL CORPORATION et al.*

No. 4627.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1933.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellants,

William C. Boone, of Shreveport, for appellee.

MILLS, Judge.

This suit is brought under the Workmen's Compensation Act (No. 20 of 1914, as amend-ed) to recover of defendant and its insurer $10.40 weekly for a period not to exceed 400 weeks and $250 medical expenses, for injuries sustained, in the course of plaintiff's employment at the oil company's plant in Shreveport, on May 25, 1932, by being struck on the head by a falling Stillson wrench.

The facts as we find them are that plaintiff, while hurrying under a scaffold about ten feet high, was struck a glancing blow on the left side of the head near the crown, by the handle of a 48 Stillson wrench, being dropped to the ground by a fellow employee working on the scaffold. This employee had stooped to lower the wrench, it falling a distance of three or four feet before striking plaintiff. The blow cut a two-inch gash in his scalp not deep or severe enough to injure the periosteum. The plaintiff was not knocked down or rendered unconscious. He testified that he was dazed, but all the other witnesses of the occurrence say that he answered questions intelligently and was in control of his faculties immediately after the accident.

He walked unaided to the first aid station at the plant and described the accident to the man in charge, who washed out the wound with alcohol and sent plaintiff to the hospital to have it sewed up. Dr. Brown, the physician at the hospital, examined him most carefully for evidences of concussion and, finding none, at the request of plaintiff allowed him to return to the plant, where he hung around all afternoon but did not work. He reported for work the next day, worked steadily for nine days, laid off for five days, and then worked steadily again for twenty-seven more days until the extra work at which he was employed gave out.

Dr. Brown treated him daily at the hospital for an infection of the scalp wound. He says that during these treatments plaintiff complained of headaches and working in the sun. The doctor considered these symptoms as a natural result of, and due to, the infection. The foreman under whom plaintiff worked after the accident says that plaintiff worked as usual until it became known the job was about to play out, after which plaintiff, for several days, came to him every morning to complain of headache and dizziness, but continued to work.

According to plaintiff's own radiologist, plaintiff's is the thickest negro skull he ever saw, being twice as thick as the ordinary skull; that, as he expressed it, it would take a pile driver to make in it a depressed fracture. Yet he says that he finds evidence of a depression under the scar, also an increase in the markings of the blood vessel grooves, and a widening of the sutures indicating intracranial pressure. In all three of these particulars he is contradicted by two ra-

*Rehearing denied December 1, 1933.

diologists for defendant who say that the pictures show an absolutely normal skull.

Drs. Huckaby, Potts, Cassity, and Palmer, for plaintiff, testify that the objective symptoms of brain injury found by them are a slurring of the speech, sluggishness of the pupillary reflexes, exaggerated deep tendon reflexes, scar on left side of head, inco-ordination of thoughts, increased spinal fluid, and weakness of grip.

Subjective symptoms related to them by plaintiff are headache, dizziness, sleeplessness, inability to work in sun, and loss of memory.

In all of the above objective symptoms they are contradicted by Dr. Furman, plaintiff's own witness, who says he found no objective symptoms of brain injury except the scar; and by defendants' expert witnesses, Drs. Brown, B. C. Garrett, Norfleet, and Atkins, an eye specialist. All of these experts testify to having made a most thorough examination. A number of fellow employees testify that plaintiff was slow-witted and forgetful, and had a slurring in his speech before the accident; that they could see no difference in plaintiff at the time of trial from his bearing, conduct, manner, and speech before the accident.

We find no preponderance of the medical or lay testimony in favor of plaintiff. As to the subjective symptoms we have only plaintiff's word. Opposed to this is the improbability that a negro of his exceptional thickness of skull would suffer a serious brain injury from the character of the blow received and the superficiality of the wound.

While the provisions of the Workmen's Compensation Act (Act No. 20 of 1914, as amended) are to be liberally construed, it is well settled that the facts relied upon must be proven with the same certainty as in other civil cases.

At this stage of the proceeding, and before argument or judgment, we find plaintiff completely shifting his position, and on a rehearing endeavoring to show that his alleged condition is due to long pre-existing syphilis aggravated and made active by the blow. Dr. Potts, who testified on the original trial that Wasserman and spinal fluid tests showed negative, now says that since the trial and after giving the plaintiff provocative drugs calculated to aggravate a syphilitic condition, a Wasserman test made by a woman technician employed by the doctors in his office building showed a positive syphilitic condition. He admits that he is principally a surgeon and not an expert on syphilis. He admits that his first tests, which proved negative, were made just before the former trial and more than four months after the injury, and that the provocative medicine giv-

en by him was just as liable to activate a syphilitic condition as the blow.

Opposed to this one expert witness offered by plaintiff, we find the testimony of Dr. Brown that on June 17th, after the accident he had a Wasserman test made by the Kolmer method, the most accepted test, which showed negative; of Dr. B. C. Garrett that he had a Wasserman test made on September 30, 1932, by Drs. Ellis and Butler, accepted authority in this section, which proved negative. He also had a spinal fluid Wasserman, the best possible test, made, which also showed negative. Of Dr. Norfleet that a Wasserman made for him by Drs. Ellis and Butler proved negative; that the provocative medicine given would be more likely to aggravate a syphilitic condition than the blow. Of Dr. Stamper, a specialist in venereal diseases, a member of the firm of Rougon & Stamper, that he had both a Wasserman and a spinal fluid test made by Drs. Ellis and Butler on December 21, 1932, after the first trial and before the trial on the reopening filed two days later, both of which proved negative; that he personally examined plaintiff and applied other tests without finding any evidence of syphilis.

We find plaintiff's second position contradictory to, and equivalent to an abandonment of, the first. We also find it much weaker than the first. The testimony fails to sustain the contention of plaintiff that his present alleged disability is due to a pre-existing syphilitic condition aggravated and made active by the blow.

The judgment appealed from is reversed, and judgment rendered rejecting plaintiff's demand. The suit being in forma pauperis, there is no judgment for costs.