## HORTON v. LOUISIANA VENEER CO.
### et al.

### No. 6002.

Court of Appeal of Louisiana.
Second Circuit.

Dec. 1, 1939.

On Rehearing May 3, 1940.

Theus, Grisham, Davis & Leigh, of Monroe, for appellants.

Dhu Thompson, of Monroe, for appellee.

HAMITER, Judge.

On August 26, 1938, plaintiff was engaged in the performance of his work with the Louisiana Veneer Company, a commercial co-partnership, and fell backward against a steam pipe and was injured. Subsequently, he commenced this action against his employer, its individual partners, and its insurer, to recover compensation under the provisions of the Louisiana Employer's Liability Act, Act No. 20 of 1914, as for total and permanent disability, and also medical expenses and costs.

It is alleged in his petition that as a "result of said fall his back including his spine, the tissues, muscles and nerves of his back were burned and also seriously injured and from which fall he received injuries to his back and spine which totally disabled him from doing any work of any reasonable character."

Defendants excepted to the petition as being vague, averring that the above quotation was plaintiff's sole allegation regarding the nature of his disability. The exception was overruled.

The only issues created by defendants' answer relate to the extent and duration of plaintiff's disability. It is admitted that the accident occurred, that the provisions of the mentioned act are applicable, and that the wages were as alleged.

Evidence was regularly adduced, after which the district court rendered judgment in plaintiff's favor for the compensation, medical expenses, and costs sought by him. The defendants appealed.

The exception of vagueness, which is reurged here, is not considered or passed on by us in view of our hereinafter announced decision.

At the time of the accident, plaintiff was 46 years of age. He had been an employee of the Louisiana Veneer Company between two and three years, working regularly as a millwright while its plant was operating. No previous injuries had been sustained during the course of the employment.

Shortly after noon on August 26, 1938, a boiler inspector visited the premises of the employer and requested the foreman to cause the escape of steam from the mill's boilers. The foreman gave plaintiff a short piece of pipe and instructed him to climb on top of the boilers and open the pop valve with it. He ascended to the mentioned location, and while handling the given article, it slipped from the valve and caused him, as he testifies, to fall "approximately six feet

back across a piece of steam pipe and it burned a pretty good place on my back." Without assistance, he descended the ladder and walked to the company's office where the burn was treated and bandaged by one experienced in first aid. His work was then resumed. This first aid person continued to dress the injury daily for about a week.

Some time later plaintiff entered the office complaining of a swelling in his back and he was sent to the company's physician. There it was found that the back possessed some limitation of motion and tenderness in the left lumbar region; however, the burned place had completely healed, leaving a scar. Treatment, consisting of the application of heat to and strapping of his back, started on November 9, 1938, and the patient was advised to rest. On December 4, 1938, the physician found no swelling of his back muscles and discharged him as being able to resume his usual work. He was instructed to return in the event of a recurrence of the trouble. No return followed.

The mill operated continuously after the accident until October 28, 1938, or for more than two months. It was then shut down until December 5, 1938, the day following the physician's discharge of plaintiff, when it reopened and ran for four days, or through December 9, 1938. No further operations are shown by the record. During the entire time that the mill functioned, plaintiff worked at the same job and received the same wage as he did prior to his falling against the steam pipe.

This suit was filed January 18, 1939, and its trial occurred during the latter part of the following March. The evidence, furnished primarily by co-workers of plaintiff and by numerous medical experts, contains many conflicts on material matters.

The first physician testifying in plaintiff's behalf is engaged in the general practice of medicine and surgery. His physical examination disclosed that the claimant had a low back strain in the sacro-iliac and sacro-lumbar regions, with rigidity and limitation of movement of the muscles, a flattening of the buttocks, and some disturbance of the third lumbar vertebra. He also noticed a leaning to one side when walking, and the experiencing of pain on motion. The burn, which was superficial and did not impair any muscles, produced no disability but left a scar about three inches wide and six inches long. Certain X-ray pictures of the back were examined but no fractures were seen. The explanation is given, however, that a roentgenologist is more qualified to interpret the pictures than he. It was his opinion that plaintiff was then disabled and that the condition found should have produced disability within ten days or two weeks following the trauma.

Another of plaintiff's medical experts, who conducts a general practice, made examinations on December 17, 1938, and subsequently, and on several occasions X-rayed the affected back. There was noted in his physical examinations the scar and a marked swelling on the back's left side, rigidity and limitation of motion of the muscles on both sides of the back, but greater on the left, and a lateral curvature of the spine. According to his interpretation of the various X-ray plates, some of which were made by him and others by defense experts, plaintiff possesses, as a result of the fall, a transverse fracture and also a crushed fracture of the third lumbar vertebra, the crushing being from top to bottom and measuring from one-eighth to one-fourth of an inch; chip fractures of the second and fourth lumbar vertebrae; a curvature of the spine at and near the junction of the twelfth dorsal and first lumbar vertebrae; traumatic arthritis at several points around the spine; and abnormal spacing between some of the lumbar vertebrae. The arthritic condition, he states, could have developed in a few months or over a period of years; and that it is not unusual for a person 40 years of age to develop arthritis without the aid of trauma. It was his opinion that plaintiff is totally and permanently disabled to do the work required of a millwright and that the disability results from the accident of August 26, 1938.

Plaintiff's third medical expert, a general practitioner and surgeon, found on his physical examinations the demarkation resulting from the burn, a slight lateral curvature of the spine, tenderness in the lumbar region, the experiencing of pain on motion, and tenseness and limitation of motion of the muscles on both sides of the back. The burn was superficial, in his opinion, and was of no im-

portance in so far as disability is concerned. His reading of the X-ray plates revealed no fractures. He states that he can locate a complete fracture in a picture, "but a very fine fracture is pretty hard to be seen by the ordinary man or ordinary surgeon", and that "An ordinary surgeon depends on his readings from an experienced roentgenologist." It was his thought that plaintiff is "completely incapacitated, and apparently permanently."

The company physician, to whom plaintiff was sent following his fall, testifies as a defense witness that his diagnosis of the found condition was a muscular strain or myositis and possible arthritis. When the patient was discharged on December 4, 1938, as being able to pursue his usual duties, there was no complaint of pain, even on motion, and no protest concerning the discontinuance of treatment.

Four other physicians appeared in behalf of defendants. One of these is a qualified roentgenologist while the remainder have had considerable experience in X-ray interpretation. All were emphatic in their testimony that none of the exhibited X-ray plates, including those made by plaintiff's expert, reveal any fractures or dislocations whatsoever. They did find a slight curvature of the spine, but this was attributed either to a postural condition, or to the position assumed when the pictures were made. Also, there appeared a spina bifida and some sacralization, neither of which is traumatically caused. Some arthritis near and around the vertebrae was noticed; however, all believed that this condition had developed over a period of several years. At least one physician states that arthritis is often found in a much more advanced state, without apparent disability or discomfort, in persons when they reach the age of forty.

The assertion that plaintiff sustained a crushed vertebra as a result of his fall backward is seriously disputed by defendants' medical witnesses. They point out that such a fracture can occur only from a blow exerting its force in the perpendicular axis of the spine either from the top downward or from the bottom upward, and that violence from the side will not produce it. Furthermore, most of them believe that plaintiff could not have performed the work which he did following the accident if his vertebra had been so fractured.

One of the defense physicians performed a complete physical examination on January 11, 1939, or seven days before suit was filed, at which time plaintiff complained of pain in the left side of his back. It is his testimony that when the patient stood still there was rigidity of the muscles on both sides of the back, and the chest muscles were likewise rigid. He states: "This gave me the impression that there was probably some voluntary element in the rigidity of the back muscles. One can't contract the muscles of the back without contracting other groups of muscles at the same time." When bending forward as directed, the patient raised his left leg backward. His observation as to this is: "It wouldn't take any particular strain off of the back muscles in bending forward to raise the leg back off the floor. In fact, the strain of having to stand on one leg and bend forward would have been greater * * *."

The physician further testifies: "I had him bend over forward and backward and he stated it aggravated his pain in the left side of his back. * * * Now, I asked this patient to strip to the waist, which I do as a matter of form in all cases and then I had him to drop his trousers and underclothing down to the floor, and when I completed my examination I told him to dress and he stooped down without any trouble and picked up his clothes, which required him to bend over. He didn't just stoop down carefully like a man with an injured back,—apparently, he wasn't at that time suffering so much pain, he picked up his clothes without any trouble."

Other pertinent testimony of this defense expert is: "Now, my idea of the resume of this situation was that Mr. Horton had no doubt fallen, as he stated that he had, and hurt his back; that it was a type of injury, with the mechanical factors taken into consideration, that had probably caused him a good deal of pain, due to the injury of the muscles to that side of the back. In other words, he got a pretty good muscular bruise. At the time I saw him, I thought he had practically completely recovered."

There is a unanimity of belief among the defense physicians that plaintiff is able to perform ordinary manual labor and to carry on his customary work.

The medical proof, in our opinion, does not preponderately support plaintiff's allegations that he is totally and permanently disabled. However, let us look to the lay testimony, as was done in Hennen v. Louisiana Highway Commission, La.App., 178 So. 654, assuming arguendo that the testimony of the physicians is irreconcilably conflicting and lends but little assistance in deciding the controversy.

Some of the co-workers of plaintiff say that he did no heavy work after the accident, notwithstanding the fact that whenever the mill operated he discharged the duties of his job and received the usual wage. Others saw no difference in the degree and kind of labor that he performed before and after August 26, 1939, except for a period of several days while the burn was healing; and they state that no complaint of a back injury was ever made.

There is much testimony of his associates that following the accident and during the mill's operation he performed such manual labor as nailing crates, putting flues in a boiler with the use of a coal chisel, working on a loader, changing the pumps and repairing pipes in the boiler room, and fixing equipment used in the loading of veneer.

A nextdoor neighbor and co-worker saw him pushing an automobile on two different occasions after the fall. One of the cars belonged to plaintiff's daughter, and she states, in her rebuttal testimony, that such an incident did not occur.

Our attention is called to the fact that plaintiff was provided a helper and was instructed to do no heavy work. The foreman states, with reference to this, that the helper was furnished for three or four days after the burn, and plaintiff was told "not to get hot and sweat; * * * it seemed to be the sweat that was irritating the burn, so we had to keep him on light work, well for a couple or three days, while we were building a conveyer."

One of the partners of the veneer company testifies that when the mill operated for the four days in December, plaintiff made no complaint about his back; however, it was known that he had been treated by the company physician and in order to be sure that he did not strain himself, the foreman was instructed to refrain from giving him heavy work.

According to the foreman, a hop was noticed in plaintiff's walk whenever the two met, except on one occasion. This exception occurred on March 1, 1939, when plaintiff was "walking nicely" until the foreman was seen; then he "gradually put on a hop."

Our careful study of all of the testimony, both lay and medical, leaves us with the conviction that the muscles in the lumbar region on the left side of plaintiff's back were bruised when he fell against the steam pipe, and that the injury caused pain from time to time. Serious doubt exists, however, that there is disability to do work of any reasonable character, as is claimed.

The jurisprudence of this state is to the effect that a compensation claimant must establish his case with legal certainty by a clear preponderance of the evidence, as in other civil suits. A judgment based on probabilities or possibilities cannot be rendered in his favor. Also, an appellate court is reluctant to disturb the decision of the trial court in a case involving only a question of fact, as here; but it is duty bound to do so when manifest error has been committed. In the instant controversy, plaintiff has not proved his demands by a preponderance of the evidence, as the law requires, and he cannot be awarded the claimed compensation.

The judgment of the trial court is reversed and set aside, the demands of plaintiff are rejected and this suit is dismissed at his cost in both courts.

### On Rehearing.

DREW, Judge.

This case is before us on rehearing. Only questions of fact are involved. Since we reversed the lower court on questions of fact, we granted a rehearing in order that we might give further study to the case. We have again carefully studied the record and are of the same opinion as when we formerly decided the case.

The medical testimony is very conflicting and, as is usually the case, we were forced to take the lay testimony in order to arrive at our decision, and in this suit the great preponderance of the lay testimony offered by both plaintiff and defendant, consisting of plaintiff's fellow employees and neighbors, is against him. A

review here of this testimony could benefit no one.

We are convinced our former judgment is correct and it is now reinstated and made the judgment of this court.