The appeal in this compensation action is being prosecuted by Milner-Fuller, Inc., and its insurer, St. Paul Mercury Indemnity Company, from a solidary judgment against them granting plaintiff an award as for total and permanent disability, less eight weeks compensation previously paid.
The issue presented and the pertinent facts surrounding the admitted accident experienced by plaintiff are clearly set forth in the following extract taken from the brief of appellant's counsel:
"The only question involved is whether plaintiff is totally and permanently disabled.
"Nathan Pringle, the plaintiff, was a negro employee of Milner-Fuller, Inc., the Ford-Mercury Dealer in Monroe, Louisiana, during the month of March, 1940.
"On or about March 9, 1940, the plaintiff, together with four negro employees of the defendant, were engaged in moving a Mercury cut away aluminum display chassis from a raised platform to the floor of the show room of defendant's place of business. Two of the negroes had hold of the back of the chassis and the other three negroes had hold of the front of the chassis. They had rolled the back end of the chassis to the floor and were in the act of rolling the front end of the chassis to the floor when the two negroes who had hold of either side of the front end became momentarily overbalanced and let the weight of the front end of the chassis fall on the plaintiff who had hold of the middle bumper of the chassis. This sudden shifting of weight caused plaintiff to fall forward with the automobile.
"Plaintiff claims that he received a fracture of his back and spine and an injury to his eyes as a result of the accident and is now totally and permanently disabled. On the other hand defendants contend plaintiff received only a slight back strain which cleared up entirely in from six to eight weeks after the accident. Plaintiff was paid compensation for eight weeks after the accident and then discharged.
"It is the defendant's contention that plaintiff received no eye injury whatsoever."
Immediately following the accident, which occurred late in the evening of Saturday, March 9, 1940, plaintiff announced that he was hurt; and, as instructed by his immediate superior, he commenced to walk to his home. After proceeding a short distance, and because of his experiencing much pain, he stopped at a taxi-cab office and requested an attendant *Page 254 
to find a physician for him. One was located at a clinic in Monroe and he was carried there in a taxi. A physical examination by the physician disclosed a rather marked strain of the lower back, attended by a spasm of the muscles thereof, and also a tendency of the body to be tilted toward the right side and forward. Adhesive strapping was applied and he was requested to return Sunday if he felt able; and, if not then on the following day.
On reaching his home, by means of a taxi-cab, he went to bed. There he remained until Monday morning when he returned to the physician's office, and the adhesive strapping was reinforced. Daily, until March 16, he made similar visits and received treatments. Then he was hospitalized until March 19. Further treatments were administered to him intermittently, these consisting of his being given sedatives, salicylates and iodides; and on April 22, such physician discharged him as being well. Regarding the discharge, the doctor testified: "I told him that I could find nothing wrong with him myself and suggested that if he still complained and still felt as though he was injured, it would be well for him to consult another physician." However, on two later occasions, namely, May 7 and May 15, he performed other examinations. They revealed no objective symptoms of injury or disability.
Subsequently, another physician made an examination of plaintiff, and on May 29, reported to his attorney that he was totally and permanently disabled to do manual labor. The filing of this suit followed on June 7.
From that date until the time of trial, commencing January 21, 1941, plaintiff submitted himself to numerous other examinations, and in all of them he gave full cooperation to the respective physicians. These included a physical examination by a medical doctor appointed by the court and an investigation of plaintiff's eyes performed by an eye specialist under a similar appointment. Also, almost weekly during that period he received treatments from a physician of his own choice.
Three days were required for the trial of the case, during which an unusually large record was built. Testifying for plaintiff regarding his alleged disability were twelve lay witnesses and two physicians. The medical men opined that he is totally and permanently disabled to do work of any reasonable character. The opinion of one of these is based on physical examinations made and on many treatments given plaintiff. The other physician not only examined the patient physically on different occasions, but also X-rayed him. In the pictures taken, he found numerous bone abnormalities existing in plaintiff's back, including several distinct fractures; and these he attributed to the accident. All of such defects were also observed by him in the X-ray plates made by doctors appearing for the defendants.
The identical pictures, that is those of both groups, were also interpreted by the defense medical experts, of which there were many. They noticed therein no fractures or other abnormal bone conditions; and by reason of their interpretations, and of the clinical examinations performed, they were of the belief that plaintiff at the time of the trial suffered no disability. In fact two of them described him as a malingerer.
The situation presented here with reference to the X-ray readings, that is the disagreement of the physicians on the question of whether or not fractures of bones are disclosed by the pictures, is certainly regrettable and is abhorred. It is almost inconceivable that such can exist; yet we have noticed its existence in several other cases of similar nature recently before this court. It was present in Richardson v. Southern Kraft Corporation, La.App., 5 So.2d 24, 25; and regarding the incredible incident we commented:
"The X-ray pictures either disclose fractures or they do not and it is unexplainable to us when we are faced with such contradictory testimony of such an issue. Either X-rays are valueless in such a case or the medical testimony is, or both."
Anent the question of the value of X-rays, there is expert testimony in the record to the effect that a fracture of a vertebra might exist which could not be discovered either through X-ray pictures or the regular physical examination.
Plaintiff's complaint about the hurting and watering of his eyes at different times following the accident was investigated by two specialists, one of whom was appointed by the court. Neither, after a thorough examination, found anything *Page 255 
wrong with his eyes. One of them did say, however, that it was possible, though not probable, for such condition to exist as a consequence of the accident.
No lay testimony concerning plaintiff's activities after the accident was offered by defendants. On the other hand, the above mentioned twelve lay witnesses produced by plaintiff, being relatives, friends and neighbors of his, testified that he had become totally disabled. Their evidence shows that before the occurrence of the injury he enjoyed good health, and was an able-bodied, hard working, and fairly regularly employed laborer; but that subsequently, and until the date of the trial, he did no work, spent most of his time in bed, used a stick as a cripple when walking, continually complained of pain in his back and in his eyes, always had a sickly appearance, and required frequent treatments and rubbing of his back.
In favoring plaintiff's claim, and by reason of the serious conflict in the medical proof, the trial judge gave great weight to plaintiff's appearance and demeanor while in court, and also to the testimony of the lay witnesses. This is shown by the following comments which we quote from his reasons for judgment:
"Plaintiff was in court during court hours for more than two days and I observed him as closely as I could for the sole purpose of catching him off his pose, if he was posing. I did not catch him. He consistently kept at all times an expression of discomfort.
"In my opinion the record discloses that plaintiff is not shrewd. Defendant's counsel seem to think that he exaggerated his case and crossed up his statements, but my observation is that he was an average plaintiff-witness of like intelligence.
"Plaintiff maintains that he still has pain, and to me his expression and actions show it.
"The lay testimony in this case is so convincing to me that I am forced to let it tilt the scales in his favor.
"Let there be judgment for plaintiff."
An appellate court is always reluctant to disturb a judgment in a case where only a factual issue is involved, as exists here, or to brand as a malingerer a compensation claimant who has been held to be disabled; and it will do neither unless the trial court's finding is manifestly erroneous.
After studying carefully all of the evidence in the voluminous record before us, we cannot say that plaintiff is a malingerer and that the trial judge has committed manifest error.
A clear distinction exists between this controversy and the case of Horton v. Louisiana Veneer Company, La.App., 196 So. 363, involving only a question of fact and in which we set aside a compensation award. In the Horton case, the medical proof was irreconcilably conflicting; but the great preponderance of the lay testimony favored the defense.
Accordingly, for the reasons above given, the judgment is affirmed.