This is a compensation suit brought by the plaintiff against the defendant Maryland Casualty Co., the compensation insurer of Armco Drainage and Metal Products Company, plaintiff's employer.
Plaintiff alleges that on Saturday, March 16, 1946, while in the employ of Armco Drainage and Metal Products Company, he was engaged with other employees in digging a pit in which to install a concrete slab and, while so doing, he slipped and fell into the pit, fracturing his left hip bone and straining both sacroiliac joints and causing or aggravating a hypertrophic arthritis in the lumbar spine, all of which injuries are painful and causing stiffness in his back, which disabilities are permanent; that he has not been paid any compensation; that his rate of pay was in excess of $30 a week.
He prays for judgment decreeing him to be totally and permanently disabled and for compensation at the rate of $20 per week for a period not exceeding 400 weeks, beginning March 16, 1946, together with *Page 473 
interest on all unpaid past due instalments and for $500 medical expenses.
Defendant, for answer, denies all of plaintiff's allegations, save that it admits that it has not paid plaintiff any compensation.
The trial of the case resulted in a judgment in favor of defendant dismissing plaintiff's suit, the trial judge holding, with written reasons, that plaintiff had failed to prove his case by a preponderance of the evidence. Plaintiff has appealed.
In this court there are only two questions presented: First, since it is now admitted by the defendant that the plaintiff suffered an accident in the course and scope of his employment, the principal question is whether or not the plaintiff was disabled and has been disabled ever since from performing hard manual labor. It is the contention of the defendant that the accident was slight and did not result in any disabling injury to the plaintiff. Second, if compensation is due, the weekly wage of plaintiff is in contest. These questions will be discussed in their respective order.
The record discloses that plaintiff was engaged in leveling a pit of 12 by 14 feet and four or five inches deep which was to be filled with a concrete slab. A slow drizzle rain was falling and the ground was slick and just soft "enough to mess you up." The plaintiff's feet slipped from beneath him and plaintiff fell backward in a split to the ground on his bottom and left hip; his body from the waist down came in contact with the ground. The accident happened on Saturday afternoon at about 2:30, March 26, 1946. The plaintiff completed the remainder of the work day, did not work on Sunday, reported to and did work on Monday, Tuesday, Friday, Saturday and Sunday, and was paid therefor. On Monday, April 4, he was referred to Dr. Godfrey, the company and the insurer physician. He reported to Dr. Godfrey on April 5.
According to plaintiff, he "got up limping in his left side," and continued to work in pain for the remainder of the day. He attempted to continue working in pain until he could not "make it no further." He then reported his condition to the superintendent, who sent him to Doctor Godfrey. He went to Doctor Godfrey's office and Doctor Godfrey treated him once. Dr. Godfrey gave him a slip to go to Doctor Williams' office to have his back X-rayed. He did not report to Dr. Williams. He has not worked or attempted to work because he was suffering with so much pain.
The record discloses, according to Dr. Godfrey's report, that plaintiff was examined by Dr. Butler, a colored doctor, on April 4, 1946. We have no report or testimony as to the findings of this doctor. Thereafter, plaintiff was examined by Dr. Godfrey, defendant's doctor, on April 5, 1946. Comment will be made further in this opinion as to Dr. Godfrey's testimony and findings.
Plaintiff was next examined by Dr. Kuehnle on April 8, 1946. Dr. Kuehnle testified that "on the first examination the pertinent physical findings were as follows: There was tenderness over both sacroiliacs and a moderate amount of spasm to the paravertebral muscles. While lying on his back he was unable to raise actively the extended left leg higher than about ten inches, and even with this he complained of considerable pain in the left side of the back." At that time, the doctor made a tentative diagnosis of sacroiliac sprain. He requested X-rays, which were made on April 9, 1946, by the office of Dr. Williams.
The X-ray examination of plaintiff was made by Dr. Arthur S. Alexander, an associate of Dr. Williams, on April 9, 1946. The report of that examination is as follows: "Examination of the entire pelvis including both hip joints and a localized projection of the left hip reveals a questionable cortical fracture 4 mms. in projected length involving the most superior margin of the greater trochanter. If this short area of translucency represents a fracture line, the fragments are in perfect position and alignment."
On the basis of this X-ray report and his physical examination of plaintiff, on April 9, 1946, Dr. Kuehnle's diagnosis was "Sacroiliac sprain and possible incomplete fracture of the cortex of the greater trochanter of the left femur." Following *Page 474 
this, plaintiff was given sixteen diathermy treatments, the first on April 9, 1946, and the last on May 1, 1946.
According to Dr. Kuehnle's testimony and report, the plaintiff had made good progress towards recovery on May 2, 1946, and was able to resume light work on May 13, 1946, the plaintiff being able to walk with almost normal posture, although he did give the impression of a slight splinting of the lower back. With regard to the fracture of the greater trochanter of the left hip, he stated that the prognosis was good. As of date of May 12, the doctor said that "the injury appears to have recovered."
The plaintiff was again referred to Dr. Kuehnle on December 5, 1946. The result of that examination, according to the doctor's testimony, "revealed pain in the sacro-iliac on extreme flexion of the extended leg. Test for sciatic nerve injury was negative. That was about the extent of the positive findings at that examination." In a letter to plaintiff's attorney, of date of December 10, 1946, relative to the examination of December 5, 1946, the doctor wrote: "The patient complains of continuous pain in the lower back, radiating down the back of the legs and pain in the left hip. X-ray examination on repeated occasions have revealed no evidence of bone or joint injury. Patient complains of tenderness over the lower back, however, no muscle spasm could be detected. On pinching the skin the patient complained of more severe pain than when pressure was applied to the muscles of the back. Straight leg raising test produced pain only on extreme flexion * * *. It is my opinion that although this man may have pain in the lower back as a result of this accident, the symptoms are far in excess of the amount of pain indicated as a result of these tests. I think that this man is exaggerating his symptoms and that he is actually able to return to work."
He was shown an X-ray report of May 21, 1946, and was questioned as to any hypertrophic arthritis in the lumbar spine of plaintiff. He read, "except for minimal hypertrophic osteoarthrosis of the lumbar spine, the vertebrae are normal in size, contour and texture." He would not venture an opinion as to whether the fall caused plaintiff's arthritic condition nor whether it aggravated a previous existing arthritis in the back, merely stating that it was possible and that the present complaints of plaintiff fit in with the picture of an aggravated arthritis.
Regardless of his previous reports and testimony, the witness, on the date of trial, expressed the opinion that the plaintiff was still suffering pain and had not entirely recovered. This opinion is based solely upon a test conducted in open court by the witness and Dr. Cosby, which test is shown as the "Robertson's Sign." With reference to this test, the witness stated that was the only objective evidence of pain he found on the day of trial. We shall further comment on this test later on in this opinion.
Upon being interrogated as to plaintiff's ability to do the work he was accustomed to do prior to the accident, the witness would not commit himself further than that he had recommended to plaintiff that he attempt to work and that it all depends whether plaintiff is willing to try to work. He added that "with the psychological factor he has there, I do not know if he will ever admit that he is not hurting as bad as he says he is." The witness further expressed the opinion that a compensation settlement would greatly benefit plaintiff's back. However, the doctor would not classify plaintiff as a malingerer.
The plaintiff next offered the testimony of Dr. J.A. Thom, a general practitioner of medicine, of Baton Rouge. He testified as follows:
"I saw him first on May 3, 1946. At that time there was rigidity of the lower spinal muscles, both on the right side and the left, but more definitely on the left, and he complained of an area of tenderness most noticeable over the left sacroiliac region. It was not well defined, but extended up the lumbar spine and over into the right
"In testing out these leg tests to determine where the trouble was, when you extended the leg on that straight leg test, the leg on the left side, when it was flexed up at right angles, extended slightly beyond, it threw the left lower lumbar muscle *Page 475 
into a spasm. The same was not true on the right side, at least was not as noticeable on the right side. I detected no sciatic pain.
"On several different occasions I made those tests on him to see how he was progressing. The treatment I used was to immobilize him with Zeo plaster. As we went along, I made several tests on him, and this rigidity of the spinal muscles became less. The last time I checked him over was today. On palpation of the back there was no definite rigidity of those back muscles, although there was more tone to the left dorsal muscle, lower spinal muscle, more tone to it, and it appeared a little larger. On flexing the leg on the leg test, these spinal muscles on the left side were not thrown into a spasm when the leg was over-flexed, not a definite spasm. It caused some rigidity of it, but not a definite spasm." Further in his testimony, he considers the X-ray findings of arthritis as fitting into the picture of the back pathology he, the witness, developed. He expressed the opinion that the plaintiff's injury had incapacited him from heavy work, but had urged him to try to do light work. "He (plaintiff) said that he knew he was not able to do a day's work for a man and that nobody would hire him." He, witness, was not of the opinion that plaintiff was a malingerer, but he considered "like we have to consider all these cases, that they (claimants) make the most they can out of the ailments they have." He had seen the plaintiff professionally at least 12 or 15 times, maybe more, the first time being on May 3 and the last time in September.
On being questioned by the Court to state in plain English what was his diagnosis, the doctor states: "I think he has a minimum of arthritis. I would have made that diagnosis without the X-ray verifying it. I felt that he had strained his back and had a minimum degree of arthritis, and I also felt that the tendons around there were involved in it, that the tendons were strained." He was of the opinion that probably the minimum of arthritis was existing prior to the injury, but that the injury aggravated the arthritic condition of his back.
It appears that Dr. Thom had plaintiff X-rayed in May, 1946, and in September, 1946, by the associate of or by Dr. Lester J. Williams.
The report of Dr. Alexander, on May 21, 1946, is as follows:
"Examination of the lumbo sacral spine including the entire pelvis and both hip joints reveals no disalignment. Except for minimal hypertrophis osteoarthrosis of the lumbar spine, the vertebrae are normal in size, contour and texture. The intervertebral discs are of normal height. The lumbo-sacral and sacro-iliac articulations reveals no changes.
"The pelvis is symmetrical. Both hip joints are of equal and normal width and their articular corticies are smooth and regular.
"A detail projection on re-examination of the left hip reveals practically complete healing of the suspected fracture at the tip of the greater trochanter. The fragments are in perfect position and alignment."
The report of Dr. Williams of date of September 30, 1946, is as follows:
"X-ray examination of the left pelvis including the hip joint and the proximal half of the left femur is negative for any present evidence of fracture, nor is there any evidence of unabsorbed callus near the superior margin of the greater trochanter."
The report of Dr. Williams of date of September 30, 1946, is as follows:
"X-ray examination of the lumbar spine and pelvis by means of antero-posterior and lateral projections is negative for present fracture or dislocation. There is no evidence of unabsorved callus near the superior margin of the greater trochanter of the left femur. The lumbar spine is normal in size, contour and texture. There is a slight hypertrophic arthritis of the entire lumbar spine. There has been no increase in the amount of hypertrophic arthritis shown since 5/14/46, as shown by a careful comparison of the films at that date and the present. The intervertebral discs are of normal height. The lumbo-sacral and sacro-iliac articulations exhibit no pathology." *Page 476 
The defendant offered the testimony of Mr. M.E. Hughes, the timekeeper of plaintiff's employer. According to this witness, the witness was about two feet from the plaintiff when plaintiff fell. Plaintiff got up, kind of smiled and looked around to see if anyone was looking at him. Plaintiff did not complain of being hurt. Plaintiff continued to work the rest of the day. The following day, plaintiff did not work. The following morning, plaintiff reported for work and complained of hurting. He, the witness, told him if he, plaintiff, didn't get any better, he should go to a doctor. Plaintiff kept on working for five days; he kept on complaining, and finally the witness gave him an order to the doctor. After he gave him the order, that was the last he saw of plaintiff. He denies that at any time after the accident plaintiff limped.
Dr. J.R. Godfrey, called by the defendant, testified that he first saw plaintiff on April 5, 1946, and that plaintiff at that time gave him a history of having slipped and fallen backwards on March 26, 1946, and that the pain resulting from the fall increased in the days that followed, and on April 4th he consulted a colored physician and received some treatments; that the plaintiff complained of pain over the general area of the lumbo-sacral joint, all the way around the left to the inguinal region. The doctor testified further that he found no objective symptoms as a result of physical examination of the plaintiff, and that he diagnosed his condition as muscle sprain of the lower back, "giving him the benefit of all doubt." Dr. Godfrey states that the attitude of plaintiff was that of a malingerer in that he grossly exaggerated his symptoms, and even stated that he knew his condition was hopeless and that no amount of treatment would do him any good. He was re-examined by Dr. Godfrey on December 10, 1946, at which time he again exaggerated his symptoms, stating that he had been in extreme pain since the accident and had been unable to work, and on this particular visit the doctor states: "Plaintiff hobbled on a cane carried in his right hand, when, as a matter of fact, his pain was supposed to be on his left side." The sum and substance of Dr. Godfrey's testimony is to the effect that plaintiff suffered some minor strain on March 26, 1946, but that he was not seriously or permanently injured, and is now capable of returning to his former work of performing manual labor.
The defendant offered the testimony of Dr. Frank Brostrom, an orthopedic specialist, of New Orleans; the doctor examined the plaintiff, on request of defendant, on October 23, 1946. His testimony was taken out of court. After thoroughly going into plaintiff's complaints, and after making a thorough examination of plaintiff, lasting about two hours, to determine his physical condition, the witness, in his report, states:
"I do not doubt that the claimant sustained a strain of the lower back from the fall on March 26, 1946, for which he received treatment. The continued complaint of pain over the crest of the left ilium that radiates over the front of the abdomen into the right hip and into the back is too absurd for the examiner to put much faith in the claimant's statements. A minor cortical fracture of the greater trochanter that has healed so perfectly, could not give rise to symptoms seven months after the accident. The range of motion of the lumbar spine, considering the man's age and obesity is in my opinion within normal limits and in view of the negative clinical findings, I see no reason why the claimant should not resume his former occupation."
In his examination and report on the plaintiff, Dr. Brostrum was questioned about X-rays taken by Dr. Teitelbaum, in charge of the Department of Radiology at Touro Infirmary, and referred to the report of this doctor. Dr. Teitelbaum's report is as follows:
"Examination of the lumbar spine reveals no disalignment. The vertebrae are of average size, contour and texture and except for minor osteoarthrosis, exhibit no evidence of injury. The intervertebral discs are of normal height. The lumbo-sacral and sacro-iliac articulations shows no changes. An antero-posterior projection of the entire pelvis including both hips and the proximal femurs and a supplementary lateral film of the left hip show the component bones to be normal in contour, texture and density. The hip joint spaces *Page 477 
are of equal and average width and the articular cortex is smooth. No evidence of disease or injury is demonstrated."
Dr. Teitelbaum, in his examination, states that such minor degenerative changes as shown by the X-rays are commensurate with a patient of middle age; but there was no evidence of injury or disease other than these. Plaintiff was 42 years of age when the X-rays were taken by him.
At the beginning of the trial, the plaintiff offered the joint testimony of Dr. Kuehnle and Dr. O.W. Cosby, an eye specialist. Dr. Kuehnle read from a book written by Dr. Otto Steinbrocker the definition of "Robertson's Sign" as "Dilation of pupils produced by pressure upon any painful area resulting from an organic lesion. In the malingerer or neurasthenic, when an alleged pain is complained of, pressure over the area fails to produce reaction." Dr. Cosby testified that the "Robertson's Sign" is the same as found in Volume I., Textbook of Ophthalmology, by Duke-Elder, an outstanding book in ophthalmology. He read from this book, under the heading of "The Phycho-Sensory Reflex": "The stimulation of any sensory nerve results in a dilation of the pupils. The dilation does not depend directly upon the physical intensity of the stimulus, but is a function also of the state of receptivity of the higher centers or after ablation of the cerebral entex. The stimulation of any sensory." The doctor states that, in short, it "simply means that if a painful stimulus occurs there is a resultant dilation of the pupil. Dr. Cosby and Dr. Kuehnle applied the test to plaintiff and to Mr. Middleton, associate counsel for defendant. Dr. Cosby testified that there were dilation of the plaintiff's pupil when Dr. Kuehnle applied pressure upon the left sacro-iliac, the lumbrosacral area of the back, and the right sacral iliac and the anterosuperior area spine of plaintiff and there were no dilation of the pupil when pressure was applied at these areas of Mr. Middleton. There was a dilation of Mr. Middleton's pupil when a painful stimulus was produced by flexion of a finger. He has only applied this test on three occasions, first in the Trimble case, second in this case, and third upon himself. He states that any stimulus to the sensory nervous system will cause dilation of the pupil, such as fear, excitement, possible extremes of temperature or emotional disturbances.
Dr. J.S. Anderson, an eye, ear, nose and throat specialist, was offered by the defendant. This doctor testified that he had no information about the "Robertson's Sign"; that prior to three or four days to the trial of the case. As to the Duke-Elder book, he states that any stimulation, either mind or the body, be it psychic or physical stimulation, will cause a dilation of the pupil. He states that the test is not an accurate test of whether a man is suffering pain. In that he is corroborated by Dr. Godfrey.
Anent the "Robertson's Sign" test conducted in open Court and the testimony offered pro and con, relative to proof of pain by the dilation of the pupils of the eye, the preponderance of the evidence shows that the doctors do not think much of this test in that it is shown that fear or other emotions will cause the pupils to dilate and that there is no way to tell the degree of pain by the dilation of the pupils. We do not attach any probative value to the test in the determination of this case.
As to the lay testimony, we have only the testimony of plaintiff's wife, of Mr. J.L. Winfree and of plaintiff.
His wife testified that although plaintiff was a hard working man supporting himself and her, since the accident plaintiff has been unable to work; plaintiff does not rest at night; sometimes she has to get up during the night and rub plaintiff with alcohol; he sleeps on a hard matress, on boards. On account of the plaintiff's condition she had to seek work and that they live on her earnings and help from her employer. Plaintiff never leaves the home and has not earned any money since the accident.
Mr. Winfree, an employee of the Gulf Refining Co., testified that plaintiff's wife is in his employ as a domestic servant and occasionally keeps the children at night for him and his wife. He knows nothing of plaintiff's ailments; he frequently takes plaintiff's wife home and on these occasions, he, during the afternoon, invariably *Page 478 
found plaintiff sitting on the porch complaining of pain and with apparent difficulty in walking from the porch to the car; plaintiff would walk with a limp and with a cane. At night, plaintiff would be up and would open the door to let his wife in. He would not see plaintiff. Witness' wife would give food and clothes to plaintiff's wife.
Plaintiff has testified that ever since he quit his employment with the Armco Drainage and Metal Work, he has not worked and cannot work on account of pain. He is corroborated by the doctors who testified in the case in that his hands are those of one who appears not to have worked. He states that none of the treatment he has received had done any good, save to give him temporary relief.
[1] It is indeed hard to understand this case. All the doctors, save Dr. Godfrey, will not classify the plaintiff as a malingerer. However, Dr. Kuehnle was of the opinion that plaintiff was able to return to work on December 5, 1946. Dr. Thom was of the opinion that in September, 1946, plaintiff should try to work, and Dr. Brostrum was of the opinion that plaintiff could return to work in October, 1946. The only reason we can see for plaintiff not returning to work is his status of mind. He has a slight case of arthritis, and which is common for his age. We believe that he has and is exaggerating his condition. We are therefore of the opinion that the preponderance of the medical testimony shows that plaintiff was fully able to return to work by December 5, 1946, and compensation will be granted unto him beginning from April 4, 1946, to December 5, 1946.
[2] During the trial of the case, plaintiff sought to introduce reports of Dr. Moss M. Brannerman's, an orthopedic surgeon of Baton Rouge, he having examined plaintiff at plaintiffs' own request. The offerings were promptly objected to by defendant unless Dr. Brannerman was offered as a witness and would identify the reports. Plaintiff refused to call the doctor as a witness. The objection was sustained. In this court, plaintiff complains of the ruling of the lower court. We find no error in the lower court's ruling. These reports are ex-parte reports of Dr. Brannerman and not properly identified. Defendant was entitled to have Dr. Brannerman in court and be cross-examined, if it desired.
[3] After the case was closed defendant then filed a motion to have the case reopened for the purpose of taking Dr. Brannerman's testimony. Plaintiff objected and stated that he would object to having Dr. Brannerman give testimony for the reason on that Dr. Brannerman was his own doctor and therefore his findings would be privileged. For that reason, the district judge denied defendant's motion. Dr. Brannerman did not testify. The testimony of Dr. Brannerman must then be presumed to have been adverse to plaintiff's case. However, the presumption does not alter our conclusion.
Anent plaintiff's wages, we find that the evidence clearly establishes that plaintiff was employed and was receiving at the time of the accident, pay at the rate of 55¢ per hour, eight-hour day, for five days a week, making his weekly wage $22, 65% of which is $14.30.
The following medical expenses have been proven Dr. J.A. Thom, $35; Dr. Lester J. Williams, $30; Dr. Moss M. Brannerman, $25; totalling $90, and which will be allowed.
For these reasons assigned, the judgment appealed from is hereby annulled, reversed and set aside. It is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant granting compensation to plaintiff in the full sum of $14.30 per week commencing April 4, 1946, and ending December 5, 1946, with legal interest on the said weekly instalments from the date each was due until paid.
It is further ordered that plaintiff do have and recover judgment against the defendant in the sum of $90, with legal interest from judicial demand until paid.
It is further ordered that the expert medical fees of Doctors O.W. Cosby and J.A. Thom be fixed at $25 each and that of Dr. G.R. Kuehnle be fixed at $50.
The defendant is ordered to pay all costs. *Page 479