LOTTINGER, Judge.
The trial judge having rendered a most comprehensive and complete opinion in this matter, we adopt it as our own. It reads as follows:
“In this suit, brought under the provisions of the Employers’ Liability Act of Louisiana, now embodied in Title 23, Section 1021, et seq. of the [LSA] Revised Statutes of 1950, plaintiff, alleging that, while in the employ of McMichael Construction Company, hereinafter referred to as the ‘employer,’ whose compensation insurance carrier was the defendant, American Mutual Liability Insurance Company, hereinafter referred to as the ‘Insurer,’ claims to have received accidental personal injuries, totally and permanently disabling him to perform work of any reasonable character, for which he seeks a judgment against the insurer, for compensation, at the rate of $30.00 per week, payable weekly, commencing June 4, 1952, and continuing for the duration of his disability, not to exceed 400 weeks, together with 5% per annum interest on all past due installments, from their respective maturities, until paid.
“Plaintiff’s additional material allegations of fact are that the employer’s business, trade or occupation, in which plaintiff was employed at the time of the accident, May 13, 1952, and in which he was performing services incidental to and arising out of the employment, and for which he was being paid a daily wage of $8.00 per day, was hazardous within the meaning of the compensation law.
“Plaintiff further alleged that the accident occurred in the following manner: That, on or about the date mentioned, while he was working in a ditch, about four feet deep, a heavy wheelbarrow, loaded with cement, accidentally fell about four feet upon him, striking him with great force, and inflicting severe and painful injuries to his back, hips and legs.
“While defendant, in its answer, denied some of the material allegations of fact contained in plaintiff’s petition, it developed on the trial and in its brief, that its actual and sole defenses are (1) that plaintiff received no disabling injury in the accident of May 13, 1952, and, in fact, said accident resulted in nothing more than a scratch on plaintiff’s leg, which caused no loss of time and required no medical attention, (2) that plaintiff has a congenitally weak back, which caused him to leave the employer’s employ long after the accident; that it was then and not until then, that he made a claim for compensation, and (3) that if plaintiff is now disabled, there is no causal connection between that disability and the accident, such disability being due solely to the congenital weakness of his back, which he has.
“The suit was filed April 14, 1953, but plaintiff’s attorneys who filed the suit subsequently withdrew and his present attorneys were substituted. The suit was tried February 9, 1956, but left open for the filing of briefs, the last of which was filed April 2, 1956, and the case submitted as of that date.
“The employer, for whom plaintiff was working, was engaged in the construction of a school building near the town of Lees-ville. At the time of the accident, (and there is no dispute of the fact that an accident did occur) plaintiff was in a ditch, into which wet cement was being poured, by hauling it thereto in wheelbarrows and dumping it therein. Plaintiff was engaged in leveling the wet cement at the bottom of the ditch as part of the building’s foundation. The colored witness, James Watson, one of the laborers engaged in pushing the wheelbarrows, loaded with cement, *495 to and dumping it into the ditch, testified that he rolled the wheel of the barrow too close to the edge of the ditch, which caused the edge of the ditch to cave off ‘and the wheelbarrow got loose from me and jammed him (plaintiff) in the ditch.’ Other witnesses, co-workers of plaintiff, testified either to actually seeing the accident happen or assisting to pull the wheelbarrow out of the ditch and extricate plaintiff therefrom.
“There is some conflicting testimony as to the depth of the ditch in which plaintiff was standing.
“The estimates of the several witnesses varied from about two to about four feet. Considering the testimony of the witness who testified on the point, the Court is of the opinion that the ditch was approximately three feet deep. The depth of the ditch may be said to be unimportant, except as a circumstance that may tend to prove or disprove whether, as the accident happened, plaintiff could have been struck on the back and the injuries to his back, of which-he here complains, thereby produced.
“If, as the Court believes the testimony shows, the depth of the hole was no more than three feet, it renders very doubtful that plaintiff’s contention that the wheel barrow struck him on the back, is tenable. The plaintiff, from the Court’s observation of him at the trial, is an average sized man, probably about five feet ten inches in height. If his legs were three feet down into the ditch, no part of his back would have been sufficiently below the surface to have been struck by the wheelbarrow’s front as it pitched down into the hole. It seems more probable that he would have been struck on the legs, and that theory is supported by the admitted fact that his leg was skinned. That the wheelbarrow struck plaintiff on the front, instead of the back, is indicated in the testimony of his witness, Watson, who was the colored man who was pushing the wheelbarrow when it fell into the ditch and the one, other than plaintiff, who was in best position to know what actually happened, at page 41 of the transcript, when he testified,: ‘Q. Well, now, when you say it “jammed him with the wheelbarrow” was the wheelbarrow in front of him? A. Yes sir, i.t was in front in the stomach.’ And it seems to the Court to be more reasonable to believe that with plaintiff standing in the ditch into which the cement was to be dumped from the wheelbarrow, he would have been facing the operation, than to have turned his back upon it.
“Plaintiff’s witness, Whitstine, who was pushing a wheelbarrow, just back of Watson, testified (Tr. 27) that he didn’t know what part of plaintiff’s body was struck by the wheelbarrow.
“Plaintiff’s witness, Boycher, who was foreman on the job, but no longer works for the employer, testified, (Tr. 45) when asked if plaintiff indicated he had been injured, ‘Yes sir, he told me his leg was skint.’ At page 46, on cross examination, the witness testified: ‘Q. You said he told you his leg was skinned? A. He showed me where his leg was skint.’ It is significant that, so far as this witness’ testimony shows, plaintiff made no complaint, immediately after the accident, to the foreman, to whom he showed his skinned leg, of any injury to his back.
“The other witnesses, who assisted in removing the wheelbarrow from the hole, did not remember what, if anything, plaintiff said.
“Mr. Monkhouse, the employer’s superintendent on the job, and to whom plaintiff reported immediately after the accident, called by the defendant as a witness, said plaintiff said he had skinned his leg, ‘between the knee and the ankle on his shin.’ (Tr. 62.) Monkhouse asked plaintiff if he wanted to go to a doctor and he said he didn’t think it would be necessary, whereupon, Monkhouse got the first aid kit and painted the leg with merthiolate and ‘that was all that was done.’ Plaintiff made no demand for compensation at that time or *496 at any other time, according to this witness (Tr. 66) and although plaintiff took the stand in rebuttal, he did not deny Monk-house’s testimony that he, plaintiff, made no demand for compensation, at that time or any other time.
“The witness, Mark, testifying for the defendant, insurer, said that the first notice of any injury of plaintiff or demand for compensation was a letter addressed to the employer by plaintiff’s first lawyers, which letter is dated February 23, 1953, or more than ten months after the accident, a copy of which was filed in evidence, marked ‘D-5.’ Plaintiff and his wife testified that the injuries to his back were so severe that he not only had to quit work in a week or ten days after the accident, but was in bed for some months as a result thereof. It is not reasonable to believe, and the Court does not believe, that had plaintiff suffered so severe an injury on May 13th, 1952, and was so incapacitated for months that he had to stay in bed, he would not, before the lapse of ten months, made demand for compensation, and especially is that true when it was shown that plaintiff is a very poor man, with a wife and several children dependent upon him for support, and had had no less than four other claims for compensation in the past.
“Another circumstance of significance is the fact that, according to plaintiff (Tr. 15) the first doctor he went to after the accident was Doctor Stephens of Hornbcck, Louisiana, but he did not call Dr. Stephens to testify as to what condition he found. He next saw doctors in Veterans Hospital and in the Charity Hospital, in Shreveport, about November of 1952, or about six months after the accident, and none of these testified in his behalf.
“In the absence of some explanation of the non-appearance of medical experts who examined the injured employee, at his own request, it must be presumed that their testimony would have been adverse to him. Walker v. Monroe [La.App.], 62 So.2d 676; Law v. Kansas City Bridge Co., Inc. [La.App.], 199 So. 155; Miller v. Anderson-Post Hardwood Lumber Co. [La.App.], 3 So.2d 196; Thomas v. Maryland Casualty Co. [La.App.], 32 So.2d 472; May v. Cooperative Cab Co. [La.App.], 52 So.2d 74; Comforts [Comforto] v. Cleveland [Cloverland] Dairy Products Co. [La.App.], 194 So. 43; Hines v. Heinkamp [La.App.], 194 So. 731; Gun-tes [Gunter] v. Alexandria Coco [Coca] Cola Bottling Co. [La.App.], 197 So. 159; Guillory v. Union Sulphur Co. [La.App.], 3 So.2d 197; Jackson v. [W.] Horace Williams Co. [La.App.], 12 So.2d 22; Moore v. Natchitoches Coco [Coca] Cola Bottling Co. [La.App.], 32 So.2d 347; Rider v. [R. P.] Fransworth Co. [La.App.], 61 So.2d 204.
“Drs. Sanders and Overdyke did testify, by depositions in behalf of plaintiff, their depositions being filed in evidence and marked ‘P-2’ and 'P-3,’ respectively.
Dr. Sanders is a general practitioner and examined plaintiff September 2, 1954, or over fifteen months after the accident. He also examined plaintiff on two occasions in 1946, in connection with a previous injury. The Doctor, referring to the difference he found on his 1954 examination, as compared with those made in 1946, said:
“ ‘In the first examination his symptoms and findings were all localized— on my examination — to the lumbar area of his back. In other words, as far as the findings in the area that said he got hurt, they were about the same only probably a little more pronounced; muscle spasm, a little more bowing of the lateral curvature of the lumbar spine. Now, on the first examination he didn’t have any of these leg findings or symptoms.’
and he said that in the first examination the leg was not atrophied.
“This witness, answering the hypothetical question that assuming an injury as related to him by plaintiff in the history that he gave, by having a wheelbarrow-load *497 of cement rolled on top of his hack, could such an injury as that have aggravated a pre-existing injury or caused the disability found in him at the time of your examination in 1952, of course, answered ‘Yes.’
“Dr. Sanders’ testimony was, of course, based largely on the assumption that plaintiff had correctly stated to him that his back was injured in the accident referred to.
“Dr. Overdyke, an orthopedic surgeon, testified that he examined plaintiff February 11, 1954, or approximately a year and ten months after the accident. After describing the condition of plaintiff, as he found it, the doctor said that the x-ray examination ‘revealed a spondylolisthesis of the fifth lumbar vertebra, described as being congenital in type * * * ’ (italics added), and that the involuntary spasm of the muscles of the back was more consistent with the x-ray findings than with his findings of tenderness over the third and fourth lumbar vertebrae, and this was also true of the neurological findings in the left calf. Dr. Overdyke also said, “If, as I think, this is a congenital type — not congenital but developmental — -type of spon-dylolisthesis, or slipping, that is visible on x-ray, it occurred little by little, over a long period of time.’ The witness explained that, as he saw the condition, he thought it was due to nature’s failure to replace the growth center of the vertebra with solid bone, which is the normal process, that evidently did not occur in this case. Plaintiff did not give Dr. Overdyke any history of a similar injury which formed the basis of a suit by him in 1946, and the Doctor said that what he found could have existed for a number of years prior to 1952.
“In behalf of the defendant, Dr. Gene D. Caldwell, testified by deposition (“D-l”) and by consent, the medical reports of Drs. Duncan and Echols (“D-2” and “D-3”) were admitted in evidence and it was stipulated that if they were present, they would testify as reflected in their reports.
“Dr. Caldwell, who is an orthopedic surgeon, examined plaintiff in March, 1953, at which time plaintiff gave him the history of the May, 1952 injury but made no mention of the back injury which resulted in the suit in 1946. After describing plaintiff’s symptoms and what he found, from the reading of which it is apparent that the Doctor was not impressed with plaintiff’s actions, he said x-rays made at the time revealed a bony defect in the arch of the fifth lumbar vertebra on the left side, and a congenital anomaly or defect in the lower angle of the articular facet of the fourth lumbar vertebra, and there was noted left lumbar scoliosis or curvature of the spine, with the apex of the curve in the second lumbar vertebra * * *.’ He did not associate the congenital condition with any injury. The Doctor said that he did not feel that plaintiff had any real disability as the result of any recent injury and that ‘he was obviously exaggerating all of his complaints, and many of his complaints were paradoxical.’ Continuing, the Doctor said further, ‘The scoliosis or curvature of the lower back which was noted was certainly old and of long standing. I was unable to account for the atrophy of the left leg in the absence of any reflex changes, and felt that that may have been there for many years. The complete stocking type of sensory loss in the left leg could not have been produced by any organic lesion or disease or injury.’
“Defendant filed in evidence the transcript of the record in Suit No. 7041, entitled Chance v. T. J. Moss Tie Co., Inc., on the docket of the Eleventh District Court, Sabine Parish, in which this plaintiff, in 1945, sought to recover compensation for alleged total disability, for injuries to his back, alleged to have occurred September 2, 1944, and which suit, the judgment of the lower court, rejecting plaintiff’s demands, was affirmed by the Court of Appeals, Second Circuit, 31 So.2d 19. There are no written reasons in the record upon which the judgment of the lower court was based, but by reference to the *498 opinion of the Court of Appeal, it is noted that its affirmation, of the judgment was based on its finding, from the evidence, that plaintiff’s trouble was congenital. The Court said:
“ ‘The three medical experts stated that there are congenital deformities in plaintiff’s spine and it is our conclusion that whatever trouble plaintiff might experience is caused from these deformities and not as a result of the accident.’
“During the course of Dr. Caldwell’s testimony in the present case, he was asked what was the result of his examination of the record, testimony, x-rays, etc. in the old suit, as compared with his examination of plaintiff in this case, and he answered:
“ ‘Well, his condition as shown in the old records was in my opinion identical with the condition at the time I examined him. The same x-ray findings were present. The congenital anomalities, the bony defects, the scoliosis or curvature of the lower segments of his back were identical.’
“Dr. Thomas Lee Duncan of Ochsner Clinic, New Orleans, according to his report, (“D-2”) admitted in evidence by consent, examined plaintiff November 18, 1954. He, too, found that plaintiff obviously exaggerated his complaints. From the x-ray pictures made at the time, he found some evidence consistent with ancient trauma but none consistent with recent trauma. So far as Dr. Duncan’s report shows, he did not receive, and had no knowledge of the history of the condition as related in the old suit. He said, among other things:
“ T do not doubt that this man has trouble from time to time with his back as a result of the congenital defect of his fifth lumbar vertebra, together with his rotoscoliosis and the effects of common labor on such a spine. I believe patient may well have aggravated his pre-existing back trouble when he was injured May 13, 1952. I do not believe he sustained any new injury at that time.’
“In the report of Dr. Dean H. Echols, (“D-3”) also admitted by consent, we find the following:
“ T am confident that this man does not have a ruptured intervertebral disk in the lumbar region because he does not describe sciatica or other type of root pain. He specifically says that the entire extremity hurts and that he cannot locate the pain. I have operated on more than 500 ruptured disks and this man presents neither the story nor the findings which I usually find in cases of ruptured disks.
“ ‘This man’s story impresses me as being unreliable. Furthermore, he deliberately exaggerated so much in the examining room that a satisfactory examination could not be made. Finally, the diminished sensibility of the entire left lower extremity could not have an organic basis.
“ ‘In summary, it is my opinion that this man has had trouble with his back and left leg off and on for many years as a result of a congenital spondylolisthesis plus the wear and tear or ordinary labor with the ordinary strains of minor injuries. It seems to me that it was inevitable the this man would try to make someone pay for his handicap. I strongly suspect that he is free from symptoms at the present time.’
“Considering the testimony of these several eminent medical experts, .(and I might say that it is more in agreement than is usually found in medical testimony) the conclusion is inescapable that whatever disability this plaintiff has, if any, flows not from the accident of May 13, 1952, but it is the result of defects in the structure of the spine that are congenital.
*499 “Plaintiff’s counsel do not argue that plaintiff doesn’t have a defective hack, but contend that the accident of May 13, 1952, aggravated that pre-existing condition and rendered plaintiff unable to work. They correctly contend that the law is that if an accidental injury activates a pre-existing injury or predisposition to a congenital weakness, so as to cause disability of an employee, he is entitled to compensation. De[o]ane v. Board of Commissioners [La.App.], 163 So. [717] 719; Wright v. Louisiana Ice and [&] Utilities Co. [14 La.App. 621], 129 So. 436; Stokes v. Miller [La.App.], 50 So.2d 509; Broussard v. R. H. Gray [Gracey] Drilling Co. [La.App.], 70 So.2d 713; Austin v. Department of Highways [La.App.], 70 So.2d 233.
“However, to enable an employee to recover under that correct postulation of the law, the proof must be, by a preponderance of the evidence, that the pre-existing condition was aggravated or activated as a result of the accident, and that proof, in this Court’s opinion, is not in this record.
“The Court recognizes that, under our law, the fact that an employee has been previously injured and has received compensation settlements in one or more previous cases, will not bar his recovery for compensation for a subsequent injury. Sibley v. Solvay Process Co. [La.App.], 25 So.2d 101. But it has also been held (Weaver v. Mansfield Hardwood Lumber Company [La.App.], 4 So.2d 781) that:
“ ‘Generally, in determining whether the latest injury sustained is com-pensable under the Employers’ Liability Act, the Court will look with great suspicion upon a case where plaintiff has had several injuries to the same part of his body.’
“As will be seen from the opinion of the Court of Appeal in plaintiff’s former case, 31 So.2d 21, he has had considerable experience in compensation settlements, having made three settlements prior to that suit and this makes the fifth claim he has made. This, of course, does not, standing alone, necessarily mean that plaintiff cannot be entitled to recover in the present case, but it does justify the Court in examining this claim with particular care.
“The Court is of the very definite opinion that plaintiff has completely failed, in this case, to make out his case, by that fair preponderance of the evidence required of him.
“While it is recognized that the Compensation Statute is to be liberally construed in favor of the employee, the burden of proof, in such a case, as in other cases of a civil nature, is on the plaintiff and he is required to make out his case by a preponderance of the evidence. McCary v. Pugh [La.App.], 70 So.2d 708; Horton v. La. [Louisiana] Veneer Co. [La.App.], 196 So. 363; Gardner v. Travelers Ins. Co. [La.App.], 12 So.2d 830; Haddad v. Commercial Motor Truck Co., 150 La. 327, 90 So. 666; Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734; Terry v. Sparco Oil Corp. [La.App.], 150 So. 391; Barrett v. Wilson [La.App.], 152 So. 795.
“For the reasons assigned, judgment will be rendered, rejecting plaintiff’s demands, without costs, the suit having been prosecuted in forma pauperis.”
A reading of the record convinces us that the factual findings of the lower Court are amply substantiated. We are unable to find manifest error on the part of the lower Court and for the reasons hereinabove assigned, the judgment of the lower Court will be affirmed.
Judgment affirmed.